2020 IL App (1st) 173023-U

FIFTH DIVISION
Order filed: May 29, 2020

No. 1-17-3023

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 92 CR 20720 (2) |
| | ) | |
| ANDRE RUDDOCK, | ) | Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE HOFFMAN delivered the judgment of the court.
Justices Rochford and Delort concurred in the judgment.

**ORDER**

¶ 1　　*Held*: We affirm the circuit court's judgment denying the defendant's postconviction petition after a third-stage evidentiary hearing on his claim of actual innocence. We reverse the court's denial of the defendant's motion for leave to supplement his postconviction petition, and consequently, we vacate the defendant's sentence and remand the matter for a new sentencing hearing.

¶ 2　　The defendant, Andre Ruddock, appeals from two orders of the circuit court of Cook

County. The first order denied his second successive postconviction petition filed pursuant to the

Post–Conviction Hearing Act (Act) (725 ILCS 5/122 *et. seq.* (West 2012)) after a third-stage evidentiary hearing on his claim of actual innocence and the second order denied him leave to file a supplemental petition under the Act alleging that his sentence was unconstitutional pursuant to *Miller v. Alabama*, 567 U.S. 460 (2012). For the reasons that follow, we affirm the circuit court's denial of the defendant's postconviction petition alleging actual innocence, we reverse its denial of his motion for leave to supplement, and we vacate the defendant's sentence and remand the matter for a new sentencing hearing.

¶ 3    The defendant, who was 16 years old at the time, and the codefendant, Rafael Cole[1], were charged with two counts of first-degree murder, conspiracy, attempted first degree murder, aggravated battery with a firearm, two counts of aggravated battery, and aggravated discharge of a firearm in connection with an August 19, 1992, shooting incident that resulted in the death of Octavia King and the injury of Kenyatta Wright.

¶ 4    Following a jury trial on October 20, 1994, the defendant was convicted of one count of first-degree murder and one count of attempted first-degree murder. The evidence presented at the 1994 trial established that, on the afternoon of August 19, 1992, an individual identified as the defendant approached a group of people standing at a bus stop near the intersection of 74th and Aberdeen. After retrieving a handgun from under his shirt, the defendant fired several shots at the group, striking the victims. Wright, who was struck twice, survived. King, who was chased by the defendant and shot again, later died.

¶ 5    During its case in chief, the State relied primarily on the testimony of three juveniles who witnessed the shooting: Terrence Sanders (16), LaToya Perkins (15), and Robert Johnson (12).

---

[1] The codefendant is, at various times, referred to in the record as Rafael, Raphael, and Ralph.

Wright, the surviving victim, testified that the shooter had a black gun but he could not recognize him because he wore a mask covering his face.

¶ 6    Sanders testified that, shortly before the shooting, he was riding in a vehicle near the area of the shooting with Vondell Sullivan and Robert Johnson. As they drove eastbound on 74th Street, Sanders saw King, Wright, Perkins, and another girl waiting at the bus stop at the intersection of 74th and Aberdeen. The car Sanders was in turned down Aberdeen, where they encountered the defendant, the codefendant, and David Evans. According to Sanders, the codefendant entered the vehicle and asked if anyone knew why King had been inquiring as to where he lived. The codefendant then announced that he was going to kill King. The defendant, who was standing just outside of the vehicle, responded to the codefendant's comment by stating that he was going to kill King instead. The defendant and the codefendant proceeded to argue over who was going to carry out the shooting of King. Sanders left the car shortly thereafter and, while he was walking home, he witnessed the shooting. He testified that he recognized the defendant as the shooter because of the shoes he was wearing and the way he was walking. On cross-examination, Sanders testified that he was currently facing criminal charges in Michigan for being an accessory-to-murder and carrying a concealed weapon. Sanders admitted that he lied to the police investigating those offenses and then changed his story. He testified that the Cook County State's Attorney had not agreed to intervene on his behalf.

¶ 7    Johnson also testified at the defendant's trial. Johnson, who was 12 years old at the time of the shooting, denied being in a vehicle with Sanders and Sullivan shortly before the shooting. He also denied hearing the defendant say that he was going to shoot King or that he saw the defendant shoot at a group of people. Rather, Johnson testified that he saw the defendant near 73rd and

Aberdeen, but he was not with Johnson's group. Later, Johnson testified that he saw an individual with a shirt over his face near 74th Street, but that he was walking away when he heard several shots being fired. Johnson stated that he could not identify the shooter.

¶ 8    Following Johnson's testimony, the circuit court permitted the State to admit, as substantive evidence, a prior written statement and grand jury testimony by Johnson, pursuant to section 115–10.1 of the Code of Criminal Procedure (725 ILCS 5/115-10.1 (West 1994)). Johnson's written statement corroborated Sanders' account of the events preceding the shooting and also described a conversation that he heard between the defendant and the codefendant, during which the defendant agreed to shoot Wright and King. According to the written statement, Johnson also heard the codefendant tell the defendant to wrap a white shirt around his face so that no one could recognize him. Johnson's grand jury testimony was substantially consistent with his written statement. At the trial, Johnson testified that he made these prior statements because the police coerced him into naming the defendant as the shooter.

¶ 9    Perkins testified that she was at the bus stop at 74th and Aberdeen when an individual approached the bus stop and shot at King and Wright. She testified that the shooter stood two feet away from her when he started shooting. She stated that, although the shooter had a white t-shirt over his face, she recognized the defendant's eyes and the jeans, underwear, and shoes that he was wearing from when she saw him earlier in the day. She testified that she had known the defendant since the seventh grade. According to Perkins, she spoke with the defendant on the phone several times after the shooting and, during one of these calls, he threatened to kill her if she "went to court." Perkins testified that her friend Francesca Silas was on the first phone call with the

defendant. On cross-examination, Perkins acknowledged that she had been hospitalized intermittently in a psychiatric ward in 1993.

¶ 10    The defense called Silas, who testified that she had known Perkins for four years, and in October of 1993, Perkins asked her to call the defendant. According to Silas, Perkins was in the psychiatric ward of the hospital at that time of the call. Silas called the defendant on a three-way line, listened to the conversation, and heard no threats. She testified that there was only one conversation and that Perkins could not have called the defendant more than that because she did not have his phone number.

¶ 11    The defendant testified on his own behalf. He testified that, at the time of the shooting, he was on 77th Street and Marshfield in his foster home until around 4:30 p.m., then he went to his girlfriend's house at 76th Street and May. He denied being in the neighborhood of 74th and Aberdeen on the day of the shooting. He acknowledged that he had once dated Perkins but testified that he did not see her after he moved out of the neighborhood and had spoken to her only once since his arrest. He denied ever discussing the shooting with her or threatening her.

¶ 12    At the close of the evidence, the jury found the defendant guilty of first-degree murder and attempted murder. On November 29, 1994, the court sentenced the defendant to concurrent terms of 55 and 15 years' imprisonment, respectively. In announcing its sentencing decision, the court stated that it had considered the presentence investigation report and was aware that the defendant was "16 years of age." The court noted that the defendant had a "difficult life" and that both his parents had died. The court also stated that it had "considered the chance for rehabilitation of the defendant" and that it felt there was "always a chance for rehabilitation, specifically since the defendant is such a young age at this time."

¶ 13    On direct appeal, we affirmed the defendant's convictions and sentences, and rejected his contention that several instances of prosecutorial misconduct deprived him of a fair trial. *People v. Ruddock,* No. 1-96-2923 (1997) (unpublished order under Supreme Court Rule 23).

¶ 14    On November 25, 1997, the defendant filed a *pro se* postconviction petition pursuant to the Act, alleging 14 separate constitutional violations, including, *inter alia*, newly discovered evidence of actual innocence in the form of an alibi witness. The circuit court summarily dismissed the defendant's petition, and we affirmed that decision on appeal. *People v. Ruddock,* No. 1-98-1409 (1999) (unpublished order under Supreme Court Rule 23).

¶ 15    On December 1, 2003, the defendant filed a combined *pro se* postconviction petition for relief from judgment under the Act (first successive postconviction petition) and under section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2002)). In his petition, the defendant alleged the following: his conviction was obtained by the use of perjured testimony given by Sanders and Perkins; the State withheld exculpatory evidence regarding Sanders, including an agreement with prosecutors to intervene in a pending case; and newly discovered evidence demonstrated his actual innocence.

¶ 16    Attached to the defendant's petition was an affidavit from Sanders in which he stated that he testified falsely at the defendant's trial because the prosecutor told him that if he gave "convincing testimony" at the defendant's trial, he would "receive leniency" on charges that were then pending against him in Michigan. Sanders further stated that he came forward with this information because he could no longer live with the knowledge that he had helped convict an innocent person.

¶ 17    On January 20, 2004, the circuit court summarily dismissed the defendant's first combined petition, stating that it was "an untimely, improper successive post-conviction petition barred in part by *res judicata* and regardless patently frivolous and without merit in its substantive allegations." On appeal from that ruling, we affirmed the dismissal of the claims contained in the defendant's first successive postconviction petition but reversed the dismissal of the requests for relief from judgment pursuant to section 2-1401 of the Code. *People v. Ruddock*, No. 1–04–0983 (2005) (unpublished order under Supreme Court Rule 23). Our decision was based on the conclusion that the defendant's allegations regarding the State's unknowing use of false testimony by Sanders and Perkins were cognizable only under section 2-1401 and that it was improper to summarily dismiss those allegations.

¶ 18    On remand, the State filed a motion to dismiss the defendant's section 2-1401 petition, asserting that it was untimely and failed to satisfy the substantive requirements of due diligence. The circuit court agreed and dismissed the petition. The defendant appealed from that order, and we affirmed, finding that the defendant's petition was untimely. *People v. Ruddock*, No. 1-06-3762 (2008) (unpublished order under Supreme Court Rule 23).

¶ 19    On June 26, 2007, the defendant asked the court for leave to file his second combined petition, which asserted claims under the Act (second successive postconviction petition) and section 2-1401 of the Code. Relevant to this appeal, the defendant's second successive postconviction petition raised a claim of actual innocence. In support of his claim, the defendant attached, *inter alia*, the previously filed affidavit of Sanders. The defendant also attached four additional affidavits, all prepared in 2004, from, *inter alia*, Josh Herron, Cortez Wraggs, and David Evans.

¶ 20    The State filed a motion to dismiss the defendant's section 2-1401 claims, arguing that he failed to demonstrate legal disability, duress, or fraudulent concealment; that the new witnesses were not previously unknown to the defendant; and that the allegation of Evans' perjury relied on hearsay.

¶ 21    On September 24, 2007, the circuit court denied the defendant leave to file a second successive postconviction petition under the Act and granted the State's motion to dismiss his section 2-1401 petition. In denying the defendant leave to file a successive postconviction petition, the court found that he failed to show cause as to why the four new affiants were previously unavailable and that the affidavits failed to demonstrate prejudice to the defendant. The court also held that Evans' grand jury perjury admission was untimely, unsupported, and unlikely to change the result on a retrial.

¶ 22    The defendant appealed the circuit court's denial of leave to file his second successive postconviction petition, arguing that the affidavits of Herron and Wraggs raised an arguable claim of actual innocence. We agreed, vacating the circuit court's denial of the defendant's leave to file the successive postconviction claims and remanding for further proceedings under the Act. *People v. Ruddock*, No. 1-07-2818 (2010) (unpublished order under Supreme Court Rule 23).

¶ 23    On remand, the defendant was appointed counsel, who filed a supplemental petition for postconviction relief on February 15, 2012. The defendant's supplemental petition attached the affidavits of, *inter alia*, Evans and Wraggs, alleging that they witnessed the shooting and would testify that the codefendant, not the defendant, was the perpetrator.

¶ 24    In his affidavit, Evans stated that he observed the shooting and, although the perpetrator was wearing a mask, he recognized him as the codefendant because he had known the codefendant

for many years. Evans admitted that, after the shooting, the police took him into custody, and he identified the defendant as the shooter for the police and before a grand jury. According to Evans, he identified the defendant only because the police beat and threatened him and showed him the codefendant's statement identifying the defendant as the shooter. He explained that he did not come forward earlier with this information because he disliked the defendant when they were younger but, having matured, he realized that no one should be imprisoned for a crime that they did not commit.

¶ 25    Wraggs' affidavit related that, on the day of the shooting, he was on a bench with someone named Frank just south of 74th and Aberdeen when he heard shots. Shortly thereafter, he saw a masked man running with a silver gun in his hand. When Wraggs pulled a gun on the masked man, the man removed the mask and said to Frank, "It's me, Ralph." Frank told Wraggs "it was cool" and Wraggs lowered his weapon. Wraggs then fled the neighborhood. In March 2004, Wraggs met the defendant in prison and learned that he had been convicted of the shooting. Wraggs averred that the defendant was not the man he had seen unmask that day.

¶ 26    On September 19, 2012, the State filed an answer and motion to dismiss the defendant's second successive postconviction petition, agreeing that a hearing was required to determine the credibility of Wraggs but asserting that allegations in the remaining affidavits should be dismissed. On January 24, 2013, the circuit court ruled that it would only advance the claims concerning Wraggs to the third-stage evidentiary hearing.

¶ 27    On October 30, 2013, the parties proceeded to a third-stage evidentiary hearing. Wraggs' testimony at the hearing was consistent with the information contained in his affidavit, though, during examination, he was unable to recall the exact date of the shooting. After Wraggs testified,

the defendant asked the circuit court to reconsider its decision regarding Evans, requesting that he be allowed to testify or that the court consider his affidavit when determining the credibility of Wraggs. The court denied counsel's request. The parties stipulated that, if called, Chicago Police officers would testify that they signed a case report indicating two witnesses saw the offender flee to the south. The parties also stipulated to a certified statement of conviction of the codefendant (92 CR 20720-01), who was convicted of conspiracy and two counts of attempted murder for the shooting. He was sentenced to 12 years' imprisonment in the Illinois Department of Corrections and subsequently died on January 22, 2000.

¶ 28    On January 9, 2014, the circuit court denied the defendant postconviction relief in a written order. The court determined that Wraggs was not a credible witness because he testified that the gun was silver when Wright testified that the gun was black and he could not recall the date of the shooting. It also found that his testimony was unlikely to change the result of the case on a retrial because Wraggs, unlike Perkins, did not witness the shooting firsthand. The circuit court pointed out that Perkins, a reliable witness, identified the defendant as the shooter. Therefore, it held that the defendant failed to make a substantial showing of his actual innocence and denied his postconviction petition.

¶ 29    The defendant appealed, arguing that the circuit court erred when it refused to consider Evans' affidavit or allow him to testify at the third-stage evidentiary hearing. We agreed and reversed the judgment of the circuit court and remanded for further postconviction proceedings. *People v. Ruddock*, 2015 IL App (1st) 140200-U. Specifically, we directed the circuit court "to consider the actual innocence claim contained in the defendant's supplemental petition, including

all of the supporting affidavits attached thereto, and conduct an evidentiary hearing on the relevant witnesses before ruling upon the petition." *Ruddock*, 2015 IL App (1st) 140200-U, ¶ 41.

¶ 30 On remand, the defendant moved to supplement his petition with an affidavit from Pyreese Wallace, and the court permitted the supplementation. The affidavit of Wallace stated that, on August 19, 1992, he exited his grandmother's house and saw the codefendant in his yard putting a t-shirt over his head "in a way that resembled a ninja mask." Wallace stated that the codefendant told him to go back in his house. Wallace then watched the codefendant exit his gangway and head toward 74th Street, where he walked toward Perkins, Wright, and King. Wallace averred that he saw the codefendant shoot at King and Wright and then he saw the codefendant run toward the baseball field. He told his grandmother what he had seen and she told him to stay in the house and "keep [his] mouth shut." According to Wallace, he "never spoke a word of what [he] saw to anyone outside of [his] family." In March of 2015, Wallace was housed in Centralia Correctional Center in the same wing as the defendant. Wallace stated that, eventually, the defendant told him that he was incarcerated for the murder of King and attempted murder of Wright. Wallace averred that his response was to laugh and then to tell the defendant that he saw the codefendant commit the shooting.

¶ 31 On February 10, 2016, the defendant filed a *pro se* "Supplemental Petition for Post-Conviction Relief," arguing that his 55-year sentence for a crime he committed as a juvenile was unconstitutional under *Miller v. Alabama*. On March 16, 2016, the circuit court denied the defendant leave to file his supplemental petition with a written order, finding that *Miller* did not apply to the defendant's *de facto*, rather than natural, life sentence. On April 29, 2016, the defendant filed a *pro se* notice of appeal of the court's denial of leave to file his supplemental

postconviction petition. On May 6, 2016, the circuit court entered an order, finding that "no final judgment had been entered" and that the *pro se* notice of appeal was filed "prematurely" and ordering that the notice of appeal "shall NOT be transmitted to the appellate court." The court directed the Office of the State Appellate Defender to file a timely notice of appeal.

¶ 32   On February 22, 2017, a third-stage evidentiary hearing was held on the defendant's actual innocence claim with Wallace and Evans testifying. Wallace testified that he is 33 years old and incarcerated in Centralia Correctional Center for the offense of Armed Habitual Criminal. Wallace also stated that he had been convicted of armed robbery and possession of a controlled substance in 2004 and 2006. Additionally, in 2007, Wallace was convicted of unlawful possession of a weapon by a felon.

¶ 33   Wallace testified that, on August 19, 1992, he was 9 years old and lived with his grandmother in the Englewood community. Wallace stated that he "knew of" the defendant because he lived in the neighborhood, but they were not friends. Wallace testified that, on that date, he witnessed a shooting that occurred on the corner of 74th and Aberdeen. Wallace explained that he went outside to take out the garbage when he saw the codefendant tying a white tee-shirt over his head. Wallace knew the codefendant because he was a neighbor. He asked the codefendant what he was doing in his backyard and the codefendant told him to go back in his house. Wallace stated that he went back inside and, from there, he saw the codefendant going through his gangway. Wallace then went out to the front porch and saw the codefendant turn right toward 74th Street. Wallace walked down the stairs and saw the codefendant cross 74th Street and start shooting toward Wright and King. After the shooting, Wallace saw the codefendant run to the baseball field in the direction of 75th Street. Wallace ran back into the house and told his grandmother about the

shooting. Wallace stated that his grandmother told him to stay in the house and not tell anyone about the shooting. Wallace did not see the defendant that day.

¶ 34    Wallace then explained that he saw the defendant in Centralia in March, and they struck up a conversation. He asked what the defendant was in for, and he told him it was for the murder and attempted murder of Wright and King. Wallace testified that his reaction was to laugh because he thought the defendant was lying. Wallace stated that, two weeks later, he prepared his affidavit about what he had seen the day of the shooting. Wallace explained that he was cooperating because the defendant was innocent, and he would want someone to say something for him if he was in the same circumstance.

¶ 35    On cross-examination, Wallace admitted that he waited twenty-five years before he spoke about what he had observed the night of the murder. He also stated that he had not seen the defendant since 1992, so he did not immediately recognize him. Wallace stated that he never saw the codefendant again and has since heard that he is dead. Wallace stated that he was first made aware that the defendant was charged in the murder when he saw him in prison.

¶ 36    Wallace also responded to questions from the court. Wallace testified that he did not speak about the case with the defendant when they were on the bus coming to court because the defendant told him it was "best" if they did not talk about it. Wallace admitted that it was the defendant's idea to write the affidavit, and that he needed last names of people from the defendant. Wallace testified that, even though he was only nine years old, he knew all the people in the gang who were involved in the shooting. Wallace also acknowledged that in 1992, Englewood was a dangerous community and the talk of the neighborhood was who was charged with the shooting. Wallace further admitted that he never inquired into who was charged with the murder. Wallace did not

talk about the shooting because his grandmother, who has since died, told him not to when it happened. As an adult, Wallace never spoke of it because no one ever approached him. Wallace did not care about it and assumed that the codefendant had been convicted for it since he never saw him after that.

¶ 37    Evans testified that he is 40 years old and is currently serving a life sentence in the Illinois Department of Corrections for two counts of first-degree murder. He testified that, on August 19, 1992, he saw a shooting on the corner of 74th and Aberdeen. According to Evans, he was standing in front of his girlfriend's house at 7317, on the porch when he first saw a man, whom he identified as the codefendant, with a gun in his waistband. Evans stated that he had known the codefendant for five or six years. He testified that he heard someone tell the codefendant that "[King] was down the street." He then saw the codefendant go inside and come out with a white t-shirt in his hands. The codefendant carried the shirt through a gangway and then re-emerged about 20 houses down with the shirt over his head being worn like a mask. Evans testified that he knew for sure this person was the codefendant. Evans stated, "I seen him continue to walk towards [King], and the crowd down there. And he raised the gun. Eventually started shooting." Evans heard four or five gunshots. Evans further testified that he saw the codefendant about 15 minutes later at 75th and Carpenter. Evans stated that he signed the affidavit in April of 2004 after another individual, Shawn Travis, typed it.

¶ 38    On cross-examination, Evans explained that Travis used to date his aunt, and that he had discussed the shooting with him around the time the codefendant died. Evans stated that Travis knew the defendant from the neighborhood. Evans testified that he was arrested the night of the shooting. According to Evans, he was put alone in a room, handcuffed to the wall, kept in custody

overnight, and not allowed to telephone his father. He stated that Detective O'Brien and another officer first questioned him an hour after he arrived. Evans initially told the officers he did not want to be involved and later told them that the codefendant was the shooter. Evans stated that Detective O'Brien then showed him statements from Johnson and the codefendant. Evans testified that Detective O'Brien choked, slapped, and beat him until he agreed to name the defendant as the shooter. Evans stated that an Assistant State's Attorney came in and spoke to him about the shooting, and he signed a handwritten statement that related the version of events that Detective O'Brien had "forced" him to say. Evans testified that Detective O'Brien was in the room with him and the ASA when he signed the statement.

¶ 39   Evans acknowledged that he testified before a grand jury. Evans testified that Detective O'Brien was in the room with him while he testified in front of the grand jury. He stated that he testified from memory based on the several statements that Detective O'Brien had shown him earlier. Evans acknowledged that he provided answers to the grand jury that were not given to him by Detective O'Brien, explaining that he "knew what needed to be said, as far as making it believable or whatever, to get out, you know, and follow suit with what he wanted me to do."

¶ 40   In response to questions from the court, Evans stated that he was not called to testify at the defendant's trial and that he did not give the information that the codefendant was the shooter to the defendant's attorneys. Evans also stated that portions of the affidavit he signed for the defendant's postconviction petition, which was prepared by Travis, were "misconstrued," but he did not call attention to it because most of the information "was on point" and he did not "think that was that big a deal." Evans stated that Detective O'Brien was the same detective who

investigated the case that resulted in his incarceration. Evans acknowledged that he never filed a complaint against Detective O'Brien and that he did not tell anyone about the abuse.

¶ 41    The State called Timothy Moran, a former Cook County Assistant State's Attorney. Former ASA Moran testified that, on August 20, 1992, he received an assignment regarding King's murder. He went to Area Three Police Headquarters and spoke with Detective O'Brien and Detective Jerry Carroll and learned that there were several people who had witnessed the shooting. ASA Moran interviewed the witnesses, including Evans. During his conversation with Evans, Detective Bernatek and Youth Officer Jefferson were in the room. ASA Moran spoke to Evans, who was not handcuffed, about what had occurred the day of the shooting. After his initial conversation with Evans, ASA Moran asked the officers to leave the room so that he could determine if Evans had been mistreated by the police and to ask if he would give a handwritten statement. Evans agreed to the handwritten statement and told ASA Moran that the officers "treated him fine." ASA Moran then had Evans removed from the room so that he could speak to other witnesses.

¶ 42    ASA Moran spoke to Evans again and put the oral statement into writing. According to ASA Moran, because Evans was under 18, the youth officer was also in the room, as was Detective Bernatek. Evans made a statement and ASA Moran read it back to him. Evans indicated that the statement was correct and signed his name at the bottom of the page. ASA Moran and both police officers also signed their names at the bottom of the page. ASA Moran testified that Detective O'Brien was not in the room when Evans made his statement and that Evans never complained he had been mistreated. ASA Moran also testified that he did not notice any injuries to Evans.

¶ 43    The parties stipulated that, if called to testify, Shauna Boliker would state that on August 20, 1992, she was an Assistant State's Attorney and had several witnesses testify before the grand jury at 26th and California. The witnesses were questioned as to their knowledge of the shooting that occurred on August 19, 1992. It was further stipulated that Boliker would testify that one of the witnesses that testified before the grand jury was David Evans. It was stipulated that when Evans testified, "neither Detective O'Brien nor any other member of the Chicago Police Department were present in the grand jury room" for Evans' testimony.

¶ 44    On November 9, 2017, the court denied the defendant's postconviction petition for relief. In a written order, the court made several findings as to the witnesses' credibility. Regarding Evans, the court found that his credibility was "severely diminished" due to the following: his first-degree murder convictions; the differences between his affidavit and testimony; the fact that the first time he alleged that Detective O'Brien abused him and fabricated the contents of his statement was on cross-examination; and his testimony that Detective O'Brien was present when he made his since-recanted statements were rebutted by the testimony of ASA Moran and the stipulated testimony of Boliker. The court also found that Evans' detailed grand jury testimony was "an accurate recitation of events as recounted by eyewitnesses."

¶ 45    As to Wallace, the court found his testimony "lacked credibility due to the overall unbelievable narrative that he conveyed to [the court] and demeanor [sic]." The court stated that his account contained "too many convenient coincidences," including the fact that he saw the shooting, never came forward, and then found himself in the same housing unit of the same correctional facility as the defendant. The court also found it convenient that the man Wallace identified as the real killer, the codefendant, was now deceased. The court also reiterated its

previous findings regarding Wraggs; namely, that Wraggs' testimony did not support a claim of actual innocence because Wraggs did not see the actual shooting, could not remember the date of the shooting, and testified that he saw the codefendant with a silver gun when Wright testified that the gun was black. The court also noted that Perkins was an eyewitness to the shooting, and she testified at the defendant's trial that he was the shooter. The court thus concluded that the testimony of the defendant's three witnesses

> "when weighed against the evidence presented at trial, falls short of providing [the defendant] of [*sic*] the complete vindication and total exoneration that are the hallmarks of an actual innocence claim. There is no basis to find that the outcome at retrial could possibly differ based on the incredible account Evans, Wallace, and Wraggs gave this Court. Accordingly, [the defendant's] actual innocence claim falls short."

This appeal followed.

¶ 46    On appeal, the defendant argues that the circuit court erred in denying his second successive postconviction petition because the court applied the incorrect standard for actual innocence claims and, thus, violated his due process right to a fair proceeding. The defendant also argues that the court made "unsupported credibility findings" regarding Wallace. Lastly, the defendant contends that the circuit court erred in denying him leave to file a supplemental postconviction petition.

¶ 47    The Act provides a three-stage procedure by which defendants can assert a substantial denial of their rights under either the federal or state constitution. 725 ILCS 5/122-1 *et seq.* (West 2006). Petitions that are not summarily dismissed at first-stage proceedings advance to the second stage, where counsel is appointed to "shape the petitioner's claims into the appropriate legal form."

*People v. Turner*, 187 Ill. 2d 406, 417 (1999). If the State is unsuccessful in moving to dismiss the petition at the second stage, the cause then advances to the third stage, where an evidentiary hearing is held to establish the truth of the petition's factual allegations. 725 ILCS 5/122-6 (West 2007); *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). At this hearing, the trial court may receive proof by affidavits, depositions, oral testimony, or other evidence and may order the defendant to be brought before the court. 725 ILCS 5/122-6 (West 2007).

¶ 48    In order to succeed on a postconviction claim of actual innocence, the defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial. *People v. Washington*, 171 Ill. 2d 475, 489 (1996). New evidence means it was discovered after trial and could not have been discovered earlier through the exercise of due diligence. See *People v. Burrows*, 172 Ill. 2d 169, 180 (1996). Material means the evidence is relevant and probative of the defendant's innocence. *People v. Smith*, 177 Ill. 2d 53, 82-83 (1997). Noncumulative means the evidence adds to what the jury heard. *People v. Molstad*, 101 Ill. 2d 128, 135 (1984). And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result. *People v. Ortiz*, 235 Ill. 2d 319, 336-37 (2009).

¶ 49    Here, the circuit court dismissed the defendant's postconviction petition after it determined that the defendant's evidence of actual innocence was not conclusive. The defendant contends, however, that the circuit court reached its decision by applying the incorrect standard for determining whether evidence of actual innocence is conclusive. In support, the defendant cites to the court's statement that his evidence fell short of "the complete vindication and total exoneration that are the hallmarks of an actual innocence claim." According to the defendant, this requirement that the evidence prove "complete vindication and total exoneration" is a higher standard than what

is normally required for proving a claim of actual innocence and, therefore, he was denied his due process right to a fair proceeding. The State responds that, when viewing the entirety of the court's order, it is clear that it applied the proper standard. As this is a pure question of law, we review the issue *de novo*." *People v. Beaman*, 229 Ill. 2d 56, 72 (2008).

¶ 50    The supreme court has stated that, when determining if the evidence of actual innocence is conclusive, "the trial court then must consider whether that evidence places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict." *People v. Coleman*, 2013 IL 113307, ¶ 97. This approach "involves credibility determinations that are uniquely appropriate for trial judges to make." *Id.* That said, "the trial court should not redecide the defendant's guilt in deciding whether to grant relief." *Id.* Rather, it is "[p]robability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *Id.*

¶ 51    After reviewing the record, we find that the circuit court applied the correct standard when determining whether the defendant's evidence of actual innocence was conclusive. To begin, we note that, in the section reciting the applicable law, the court stated that the defendant's evidence needed to be "of such a conclusive character that it would probably change the result on retrial." This is the correct standard for determining whether evidence of actual innocence was conclusive. Elsewhere in the order, the court stated that it was denying the defendant's postconviction petition because there was "no basis to find that the outcome at retrial could possibly differ based on the incredible account Evans, Wallace, and Wraggs gave" to the court. In other words, the court focused on "[p]robability, not certainty" in predicting what another jury would do. *Coleman*, 2013 IL 113307, ¶ 97. Moreover, the passage that the defendant takes offense to does not necessarily

misstate the law. As we have stated before "[a]ctual innocence is not the same as sufficiency of the evidence or reasonable doubt, nor mere impeachment of trial witnesses, but a claim of vindication or exoneration." *People v. Mabrey*, 2016 IL App (1st) 141359, ¶ 23. Accordingly, we conclude that the circuit court applied the correct standard when it reviewed the defendant's evidence.

¶ 52    Next, the defendant challenges the circuit court's determination that Wallace was incredible and argues that Wallace's testimony alone, when weighed against the evidence presented at the defendant's trial, should have been sufficient for the circuit court to grant him a retrial. The defendant does not make any arguments as to the court's credibility determinations of Evans or Wraggs.

¶ 53    At a third-stage evidentiary hearing, the trial court acts as the fact finder and determines the credibility of the witnesses and the weight to be given their testimony and resolves any conflicts in the testimony. *People v. Domagala*, 2013 IL 113688, ¶ 34. We review the trial court's decision to deny relief following an evidentiary hearing for manifest error. *Coleman*, 2013 IL 113307, ¶ 98. Manifest error is error that is clear, plain, and indisputable. *Id.*; *Ortiz*, 235 Ill. 2d at 333. "[A] decision is manifestly erroneous when the opposite conclusion is clearly evident." *Coleman*, 2013 IL 113307, ¶ 98. This standard of review "recognizes that 'we must give great deference to the trial court's factual findings because the trial court stands in the best position to weigh the credibility of witnesses' " who testify at the third-stage evidentiary hearing. *People v. Hotwagner*, 2015 IL App (5th) 130525, ¶ 31 (quoting *In re Floyd*, 274 Ill. App. 3d 855, 867 (1995)).

¶ 54    In the instant case, the court found that Wallace "lacked credibility due to the overall unbelievable narrative that he conveyed to [the court] and demeanor [*sic*]." The court's written

order did not elaborate as to what it found objectionable regarding Wallace's demeanor, however, it did state that Wallace's account contained "too many convenient coincidences" and featured "entirely aberrant behavior by Wallace and [the defendant]." Specifically, the court found it convenient that Wallace, an eyewitness that could prove the defendant's innocence, "happened to find himself in the same housing unit of the same correctional facility as [the defendant]" and that Wallace would share this information with defendant upon their first meeting. The court also found it convenient that the individual Wallace claimed committed the shooting, the codefendant, is now deceased. Moreover, the court noted that, at the defendant's trial, Perkins, who was standing next to the victims when the shooting occurred and had known the defendant since the seventh grade, identified the defendant as the shooter.

¶ 55    The defendant nevertheless argues that the circuit court erred in determining Wallace's credibility. He contends that "there is simply nothing inherently unbelievable about two men, both from the same high-poverty, high-crime urban neighborhood, who were acquainted as juveniles, becoming re-acquainted later in life in the Department of Corrections." He also contends that Wallace's identification of the codefendant as the shooter enhances, rather than detracts, from his credibility because the codefendant was, in fact, convicted for his involvement in this case. Lastly, he contends that Perkins' credibility was impeached at trial due to her 1993 hospitalization in a psychiatric ward.

¶ 56    After reviewing the record, we find that there is nothing manifestly erroneous about the circuit court's determination that Wallace was incredible. To begin, the circuit court stated that part of the reason it found Wallace incredible was his demeanor and, although the circuit court did not elaborate further, we are mindful that a witness' in-person demeanor plays a significant role in

helping to determine credibility. As the supreme court has noted, "the post-conviction trial judge is able to observe and hear the witnesses at the evidentiary hearing and, therefore, occupies a 'position of advantage in a search for the truth' which 'is infinitely superior to that of a tribunal where the sole guide is the printed record.' " *People v. Coleman*, 183 Ill. 2d 366, 384, (1998) (quoting *Johnson v. Fulkerson,* 12 Ill. 2d 69, 75 (1957)). Moreover, we cannot say that the circuit court's determination that the defendant and Wallace's meeting in prison was a "convenient coincidence" is so erroneous that the opposite conclusion is clearly evident. We also note that the defendant's insistence that Perkins' credibility is impeached because she was hospitalized in a psychiatric ward is unpersuasive because the jury heard that information at trial and still convicted the defendant based, in part, on her eyewitness testimony. Accordingly, we conclude that the circuit court did not err when it denied the defendant's postconviction petition for relief.

¶ 57    The defendant's final contention on appeal is that the circuit court erred in denying him leave to a file a supplemental postconviction petition that alleged his 55-year sentence, imposed for a crime he committed while he was a juvenile, violated the eighth amendment to the United States Constitution (U.S. Const., amends. VIII, XIV) pursuant to *Miller* and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. 1, § 11).

¶ 58    Before we begin, we must first address whether we have jurisdiction to hear this claim because the defendant's notice of appeal only references the circuit court's November 9, 2017 order denying his actual innocence claim and does not reference the court's March 16, 2016 order denying his motion for leave to supplement. We conclude that we do have jurisdiction to consider this issue.

¶ 59    It is true that, in general, "[a] notice of appeal confers jurisdiction on an appellate court to consider only the judgments or parts of judgments specified in the notice." *People v. Lewis*, 234 Ill. 2d 32, 37 (2009). Nevertheless, "the unspecified judgment is reviewable if it is a step in the procedural progression leading to the judgment specified in the notice of appeal." (Internal quotations omitted.) *Burtell v. First Charter Service Corp.*, 76 Ill. 2d 427, 435 (1979). Here, the defendant filed a *pro se* motion to supplement his second successive postconviction petition, which the court denied. The defendant filed a *pro se* notice of appeal after the court denied his motion for leave to supplement, but the court ordered that the notice not be sent because no final judgment had been entered and, therefore, the notice was prematurely filed. On November 9, 2017, the court denied the defendant relief based on the remaining allegations contained in his second successive postconviction petition. As a result, we conclude that the denial of the defendant's motion to supplement his postconviction petition was clearly a step in the procedural progression leading to the denial of his postconviction petition, which was the final judgment in this case. Thus, we have jurisdiction to review that denial.

¶ 60    Generally, a petitioner may file only a single postconviction petition under the Act. 725 ILCS 5/122-1(f); *People v. Edwards*, 2012 IL 111711, ¶ 29. The bar against successive proceedings is relaxed in two situations: (1) where the petitioner can establish cause and prejudice for failing to raise the claim in the original postconviction proceeding; or (2) where the defendant raises a colorable claim of actual innocence. *Edwards*, 2012 IL 111711, ¶¶ 22-23; 725 ILCS 5/122-1(f) (West 2016). Under the Act, "cause" is defined as an objective factor that impeded the petitioner's ability to raise a specific claim during his prior post-conviction proceedings;

"prejudice" is occasioned by an error which so infected the trial that the resulting conviction or sentence violated due process. 725 ILCS 5/122-1(f) (West 2016).

¶ 61    Here, the defendant argues that he satisfied the cause-and-prejudice test because his petition showed "cause" where the legal basis for his constitutional claims did not exist when he filed his initial postconviction petition, and because his petition showed "prejudice" since it presented a viable claim that his 55-year sentence was unconstitutional, as-applied, under the federal and state constitutions.

¶ 62    The State agrees with the defendant that the circuit court erred when it denied the defendant leave to file his supplemental postconviction petition and "this issue is properly before this court." However, the State maintains that this court should not remand for further proceedings because the defendant was sentenced prior to the "truth-in-sentencing" statute being enacted and is, therefore, entitled to day-for-day credit. See 730 ILCS 5/3-6-3(a)(2) (West 1994) ("[T]he prisoner shall receive one day of good conduct credit for each day of service in prison other than where a sentence of 'natural life' has been imposed. Each day of good conduct credit shall reduce by one day the inmate's period of incarceration set by the court."). As a result, the State maintains it is "likely" the defendant will only be required to serve a term of 27.5 years. Consequently, the State argues that we should consider the defendant's sentence as a 27.5-year term, which is below the 40-year mark for a *de facto* life sentence.

¶ 63    In *Miller*, the United States Supreme Court held that the eighth amendment to the United States Constitution "forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." Miller, 567 U.S. at 479. The Court emphasized that "[m]andatory life without parole for a juvenile precludes consideration" of numerous mitigating factors,

including the juvenile's age and its "hallmark features," and the possibility of rehabilitation. *Miller*, 567 U.S. at 477-78. Additionally, the Court held that "a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles." *Id.* at 489. In *Montgomery v. Louisiana*, 577 U.S. ——, ——, 136 S. Ct. 718, 736 (2016), the Court clarified that *Miller* applies retroactively "to juvenile offenders whose convictions and sentences were final when *Miller* was decided," including cases on collateral review.

¶ 64　The Illinois Supreme Court has ruled that *Miller* applies to discretionary, as well as mandatory life sentences, (*People v. Holman*, 2017 IL 120655, ¶ 40), and also to *de facto* life sentences, or sentences "that cannot be served in one lifetime" and have "the same practical effect on a juvenile defendant's life as would an actual mandatory sentence of life without parole" (*People v. Reyes*, 2016 IL 119271, ¶¶ 9-10). Recently, our supreme court in *People v. Buffer*, 2019 IL 122327, concluded that a sentence exceeding 40 years was a *de facto* life sentence, requiring the sentencing court to consider "[the] defendant's youth and its attendant circumstances." *Buffer*, 2019 IL 122327, ¶¶ 41-42.

¶ 65　We have recently addressed the issue of day-for-day credit in *People v. Peacock*, 2019 IL App (1st) 170308, appeal filed, November 1, 2019, and concluded that the availability of statutory sentencing credit is irrelevant to the determination of whether a defendant has been sentenced to a *de facto* life sentence. The court in *Peacock* based its decision on the fact that the "[d]efendant's receipt of day-for-day credit is not guaranteed" and "the trial court has no control over the manner in which a defendant's good conduct credit is earned or lost." In *People v. Thornton*, 2020 IL App (1st) 170677, we were presented with the same issue and followed *Peacock*.

¶ 66    The State argues here, as it did in *Thornton*, that *Peacock* was wrongly decided. Specifically, the State contends *Miller* makes clear that only sentences that are the equivalent of a life sentence *without parole* violate the eighth amendment. See *Miller*, 567 U.S. at 479. In support, the State cites to *Miller*'s determination that "[a] State is not required to guarantee eventual freedom to a juvenile offender" but must only provide "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Miller*, 567 U.S. at 479 (quoting *Graham v. Florida*, 560 U.S. 48, 75 (2010)). The State thus maintains that a defendant who is statutorily entitled to cut his sentence in half by exhibiting good behavior while in prison has been afforded such an opportunity. See *People v. Evans*, 2017 IL App (1st) 143562, ¶ 14 (finding that a defendant who was eligible for day-for-day good conduct credit is "out of the *Miller* category, since he is not serving a sentence without the possibility of parole."). In other words, the State argues that the defendant's sentence is a *de facto* life sentence with the possibility of parole and, therefore, it is outside of *Miller*'s scope. We disagree.

¶ 67    As we stated in *Thornton*:

> "We acknowledge that *Miller* and its progeny focus on life sentences without the possibility of parole and the defendant's sentence does include the possibility of release after 35 years served. That said, as *Peacock* noted, day-for-day credit is not guaranteed and it is IDOC, not the circuit court, that has the ultimate discretion as to whether the defendant will be awarded any credit. [Citation.] Moreover, in the instant case, the defendant will not serve a sentence shorter than a 40-year *de facto* life sentence unless he receives a substantial portion of the good conduct credit for which he is eligible. Although the State maintains that "it is more than likely" that the defendant will earn that credit and be released after 35

years' imprisonment, we conclude that the State's assurances are not enough for us to consider the defendant's sentence as anything other than a 70-year term. Accordingly, we conclude that, regardless of the defendant's eligibility for day-for-day credit, his extended term of 70 years' imprisonment is a *de facto* life sentence that requires a sentencing court to consider his youth and attendant circumstances." *Thornton*, 2020 IL App (1st) 170677, ¶ 22.

We once again reach the same conclusion. Accordingly, we conclude that the defendant's 55-year sentence, imposed for a crime he committed at age 16, is a *de facto* life sentence.

¶ 68    We also conclude that the circuit court failed to consider the defendant's youth and its attendant circumstances in imposing the defendant's sentence. As our supreme court has stated, a juvenile defendant may be sentenced to life or *de facto* life imprisonment, but before doing so, the trial court must do the following:

"[D]etermine[ ] that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. The court may make that decision only after considering the defendant's youth and its attendant characteristics. Those characteristics include, but are not limited to, the following factors: (1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own

attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *People v. Holman*, 2017 IL 120655, ¶ 46; see also *Buffer*, 2019 IL 122327, ¶ 19.

¶ 69    After reviewing the record, we conclude that the circuit court did not adequately consider the defendant's youth and attendant circumstances before sentencing him to a *de facto* life sentence. Although the record indicates that the circuit court did consider some characteristics of youth before imposing the defendant's sentence, under *Holman*, its consideration was insufficient to support the imposition of a *de facto* life sentence.

¶ 70    Having reached this conclusion, we note that the proper remedy is to remand this matter for a new sentencing hearing rather than for further postconviction proceedings. See *Buffer*, 2019 IL 122327 ("Based on the particular issue raised in this appeal and in the interest of judicial economy, we agree * * * that the proper remedy is to vacate defendant's sentence and remand for a new sentencing hearing."). Furthermore, the defendant shall be entitled on remand to be sentenced under the scheme prescribed by section 5-4.5-105 of the Unified Code of Corrections (730 ILCS 5/5-4.5-105 (West 2016)). See *Buffer*, 2019 IL 122327, ¶ 47.

¶ 71    Having concluded that the defendant's sentence is unconstitutional pursuant to *Miller*, we need not address the defendant's alternative arguments that his sentence violates the Illinois proportionate penalties clause.

¶ 72    For these reasons, we affirm the circuit court's denial of the defendant's postconviction petition as to his claims of actual innocence; and we reverse the circuit court's denial of the defendant's motion for leave to supplement his postconviction petition, vacate his sentence, and remand the case to the circuit court for resentencing consistent with this decision.

¶ 73    Affirmed in part and reversed in part; sentence vacated and remanded with directions.