# Illinois Official Reports

## Appellate Court

---

## *People v. Simms*, 2021 IL App (1st) 161067-B

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. AHMAD SIMMS, Defendant-Appellant. |
| District & No. | First District, Third Division<br>No. 1-16-1067 |
| Filed<br>Modified upon<br>denial of rehearing | January 20, 2021<br><br>May 19, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 00-CR-1137; the Hon. Stanley J. Sacks, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Deepa Punjabi, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Clare Wesolik Connolly, and Lisanne P. Pugliese, Assistant State's Attorneys, of counsel), for the People. |

Panel                                                        PRESIDING JUSTICE HOWSE delivered the judgment of the court, with opinion.
Justices Ellis and Cobbs concurred in the judgment and opinion.

## OPINION

¶ 1        Defendant Ahmad Simms[1] appeals from the denial of his *pro se* motion for leave to file a successive postconviction petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)). He argues he should be permitted leave to file a successive petition because he presented an actual innocence claim based on newly discovered evidence. For the following reasons, we reverse and remand for second stage postconviction proceedings.

¶ 2                                      I. BACKGROUND

¶ 3        On November 27, 1999, the body of Susie Irving was discovered inside her apartment on the 7000 block of South Michigan Avenue. Dr. Thamrong Chira, Cook County deputy medical examiner, testified, as an expert in forensic pathology, that he performed an autopsy on Irving and found the cause of death to be a single contact gunshot wound above her right forehead. Dr. Chira recovered a bullet from Irving's head and determined the manner of death to be homicide.

¶ 4        In January 2000, defendant, along with codefendants, Lino Niles and Curtis King, were charged, by indictment, with five counts of first degree murder, six counts of home invasion, and one count each of armed robbery, residential burglary, and possession of burglary tools. Prior to trial, the State nol-prossed the residential burglary and possession of burglary tools charges. Defendant and Niles were tried in separate but simultaneous jury trials. Defendant was convicted of first degree murder, armed robbery, and home invasion. He was sentenced to a total of 60 years' imprisonment: a 45-year term for first degree murder and two concurrent 15-year terms for armed robbery and home invasion to be served consecutively to his murder sentence. We affirmed on direct appeal. *People v. Sims*, 349 Ill. App. 3d 1037 (2004) (table) (unpublished order under Illinois Supreme Court Rule 23).

¶ 5        Prior to trial, defendant filed a motion to suppress evidence, claiming that his statements to the police were involuntarily made. The trial court denied the motion, finding that defendant was advised of his rights and there was no credible evidence that the police violated his constitutional rights.

¶ 6        Because defendant presents a claim of actual innocence based on an affidavit from Niles purporting to state that defendant was not involved in the crime, we will, at the appropriate time, recount in detail the evidence of defendant's involvement in the offense presented at his jury trial. At this juncture, we provide an overview of the events that led to Irving's death.

¶ 7        At trial, the State's theory of the case was that defendant was guilty of the murder by accountability. According to the State's theory of the case, defendant, Niles, and King planned to burglarize Irving's apartment. In the afternoon of November 27, 1999, defendant, Niles, and

---

[1]We note that defendant also goes by the name Ahmad Sims, as in *People v. Sims*, 349 Ill. App. 3d 1037 (2004) (table) (unpublished order under Illinois Supreme Court Rule 23).

King forced their way into Irving's apartment and shot and killed her. They then removed various items from the house, including a video cassette recorder (VCR), a coin collection, a small baseball bat, a small television, a maroon attaché case, a small briefcase containing some coins, a Christian Brothers brandy bottle containing coins, and a comforter. They later sold some of the items at an auto shop nearby and left some of the items in the garbage behind the same auto shop. Many of these items were recovered by police during their investigation, and the items were identified as belonging to Irving. Defendant also admitted to law enforcement, via a written statement and a videotaped statement, that he assisted Niles in breaking into and robbing Irving's apartment but claimed that Niles was the shooter.

¶ 8        Evelyn Parks testified that, on November 27, 1999, she lived with her 84-year-old sister, Susie Irving, in an apartment on the 7000 block of South Michigan Avenue in Chicago. On that day, Parks left the apartment between 11:30 a.m. and noon. When she returned home about 6 p.m., she learned that the apartment had been broken into and Irving had been killed via a gunshot wound to the head. Items missing from the apartment included a VCR, a coin collection, a small baseball bat, a small television, a maroon attaché case, a small briefcase containing some coins, a Christian Brothers brandy bottle containing coins, and a comforter.

¶ 9        Anthony Hawkins, the nephew of Parks and Irving, testified that he lived in the apartment above them. He left the building that day about 10:45 a.m. He returned to the apartment about 2 p.m. with his daughter, niece, and nephew, and he saw that the basement door latch was broken. His niece saw Irving lying on the floor in the apartment. Hawkins saw blood on her head and noticed that her walker had been tipped over. He then called 911. He also testified that there was some damage to his own apartment door.

¶ 10       Chicago police detective Michael Baker testified that he investigated Irving's murder. About 3:15 p.m. on November 27, 1999, he was directed to Irving's address. Upon approaching the apartment, he noticed some damage to the door. He then saw Irving's body on the floor and observed that the apartment was in disarray. He also later observed damage to the basement door, the second-floor door, and the exterior door to the basement.

¶ 11       About 10:45 p.m. that day, Baker received an anonymous phone call that led him to search a dumpster and garbage cans on the property of J&B Auto Repair, located just two buildings away from Irving's apartment building. Inside the dumpster, Baker found a purple attaché case, a vinyl case, and a broken Christian Brothers brandy bottle with coins in it. He also found a comforter and a small baseball bat inside a garbage can. Photographs of these items were later shown to Parks, who identified them as being taken from her apartment.

¶ 12       Chicago police forensic investigator Thomas Ginnelly testified that he was assigned to the crime scene at Irving's apartment building. During a search of the living room for firearms evidence, he located a cartridge case underneath a couch cushion. The case was from a .25-caliber gun.

¶ 13       The jury found defendant guilty of first degree murder, armed robbery, and home invasion. Defendant moved for a new trial, which the trial court denied. The court then sentenced him to a 45-year term for first degree murder and two concurrent 15-year terms for armed robbery and home invasion to be served consecutively to his murder sentence.

¶ 14       Defendant filed a direct appeal, arguing that the trial court erred in denying him his right to confront and cross-examine a witness at trial regarding the witness's bias or motive for testifying. This court affirmed his conviction and sentence and directed his mittimus to be corrected. *Sims*, 349 Ill. App. 3d 1037.

¶ 15    On July 8, 2005, defendant filed a postconviction petition under the Act, which raised several claims. The trial court determined that the petition was frivolous and patently without merit and summarily dismissed his petition on August 15, 2005. On appeal, this court affirmed that order, after granting appointed counsel's motion for leave to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987). *People v. Simms*, No. 1-05-3100 (2007) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 16    On September 29, 2011, defendant filed a *pro se* petition for *habeas corpus* relief. The trial court denied defendant's petition on October 6, 2011. This court affirmed, after granting appointed counsel's motion for leave to withdraw pursuant to *Finley*. *People v. Simms*, No. 1-11-3528 (2012) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 17    On April 19, 2013, defendant filed a *pro se* motion for leave to file a successive postconviction petition, along with an affidavit from Niles. We discuss Niles's affidavit in detail below. In the motion, defendant raised numerous claims, including that (1) law enforcement officers had no legal basis to arrest him, (2) his confession was involuntary, (3) his constitutional rights were violated when the State unlawfully amended his indictment, (4) he was denied his right to a fair trial, (5) he was denied effective assistance of counsel, and (6) the trial court prevented the jury from considering defendant's defense by instructing the jury to disregard that evidence.

¶ 18    The trial court addressed each claim individually and denied defendant leave to file the successive petition, concluding that defendant failed to satisfy the cause-and-prejudice test or to set forth a colorable claim of actual innocence. Defendant now appeals, arguing the trial court should have granted him leave to file a successive postconviction petition and that petition should advance to second-stage postconviction proceedings because Niles's affidavit constitutes newly discovered evidence that states a colorable claim of actual innocence.

¶ 19    As a threshold matter, we note that defendant did not explicitly raise a claim of actual innocence in his motion for leave to file a successive petition. However, because postconviction petitions are to be liberally construed and the content of Niles's affidavit is sufficient to raise a claim of actual innocence, we will address whether the court erred in denying defendant leave to file a successive petition. See *People v. Pack*, 224 Ill. 2d 144, 150 (2007) (stating postconviction petitions are to be " 'liberally construed to afford a convicted person an opportunity to present questions of deprivation of constitutional rights' " (quoting *People v. Correa*, 108 Ill. 2d 541, 546 (1985))).

¶ 20                                   II. ANALYSIS
¶ 21    The Act permits a defendant to collaterally attack a conviction by asserting it resulted from a "substantial denial" of his constitutional rights. 725 ILCS 5/122-1(a)(1) (West 2016). However, the Act does not contemplate the filing of successive postconviction petitions. *People v. Edwards*, 2012 IL 111711, ¶ 22. As such, "[s]uccessive postconviction petitions are disfavored under the Act," and a defendant must first obtain leave of the court under one of two exceptions. *People v. Jones*, 2017 IL App (1st) 123371, ¶¶ 41, 45. In order to file a successive petition, the defendant's petition must satisfy the cause-and-prejudice test or it must state a colorable claim of actual innocence. *People v. Jackson*, 2016 IL App (1st) 143025, ¶ 19. The latter claim is permitted because "a wrongful conviction of an innocent person violates due process." *People v. Williams*, 392 Ill. App. 3d 359, 367 (2009). When a defendant raises a claim of actual innocence "leave of court should be granted when the petitioner's supporting

documentation raises the probability that 'it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.' " *Edwards*, 2012 IL 111711, ¶ 24 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). The requirements for establishing a claim of actual innocence are as follows:

> "[T]he defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial. [*People v. Washington*, 171 Ill. 2d 475, 489 (1996)]. New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence. See [*People v. Burrows*, 172 Ill. 2d 169, 180 (1996)]. Material means the evidence is relevant and probative of the petitioner's innocence. *People v. Smith*, 177 Ill. 2d 53, 82-83 (1997). Noncumulative means the evidence adds to what the jury heard. [*People v. Molstad*, 101 Ill. 2d 128, 135 (1984)]. And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result. [*People v. Ortiz*, 235 Ill. 2d 319, 336-37 (2009)]." *People v. Coleman*, 2013 IL 113307, ¶ 96.

To this end, "all well-pleaded facts that are not positively rebutted by the trial record are taken as true." *People v. Harper*, 2013 IL App (1st) 102181, ¶ 38. We review a trial court's ruling on a motion for leave to file a successive postconviction petition *de novo*. *People v. Bailey*, 2017 IL 121450, ¶ 13.

¶ 22    Here, defendant claims that he has presented a colorable claim of actual innocence based on Niles's affidavit. Defendant argues this affidavit tends to exonerate him in the commission of these offenses.

¶ 23    We first address whether Niles's affidavit constitutes new evidence. Niles's affidavit did not specifically state why defendant could not have obtained his testimony sooner, nor did defendant allege what efforts he had taken to obtain this new account previously. See *People v. Barnslater*, 373 Ill. App. 3d 512, 525 (2007) (concluding that the evidence was not "newly discovered" because defendant did not show that the victim's recantation could not have been obtained earlier). However, as a codefendant, Niles had a "fifth amendment right to avoid self-incrimination," and thus, "[n]o amount of diligence could have forced him to violate that right if he did not choose to do so." *Edwards*, 2012 IL 111711, ¶ 38; *People v. Molstad*, 101 Ill. 2d 128, 135 (1984); *Harper*, 2013 IL App (1st) 102181, ¶ 42. We find the affidavit constitutes new evidence. We also find, and the State does not argue to the contrary, that the affidavit is both material and noncumulative. Niles's averments are relevant and also potentially probative of defendant's innocence. The evidence is also not cumulative because no one at trial testified that defendant was not involved in the offenses, which goes to an ultimate issue in the case. See *People v. Ortiz*, 235 Ill. 2d 319, 336 (2009) (citing *Molstad*, 101 Ill. 2d at 135).

¶ 24    Turning to the question of whether Niles's affidavit is so conclusive it would probably change the result on retrial, we initially stated that we would rely on our supreme court's decision in *People v. Sanders*, 2016 IL 118123, and the decision by the United States Supreme Court in *Schlup*, 513 U.S. 298. Following our giving of "careful[ ] consider[ation of] what it means for the evidence to be taken as true unless positively rebutted by the record" and for the evidence to "probably lead to a different result" (internal quotation marks omitted) (*People v. Simms*, 2020 IL App (1st) 161067, ¶ 24), we "d[id] not find that Niles's affidavit constitutes conclusive evidence that would probably lead to a different result at trial" (*id.* ¶ 44).

¶ 25    On September 30, 2020, our supreme court issued a supervisory order directing this court to vacate our judgment and to "consider the effect of [its] opinion in *People v. Robinson*, 2020

IL 123849, on the issue of whether defendant presented a colorable claim of actual innocence based on the affidavit presented with the motion for leave to file a successive post-conviction petition." *People v. Simms*, No. 126080 (Ill. Sept. 30, 2020) (supervisory order).

¶ 26 In *Robinson*, our supreme court addressed the question of whether the evidence in that case "was of such a conclusive character as would probably change the outcome on retrial." *Robinson*, 2020 IL 123849, ¶ 54. Our supreme court began noting that the lower courts "erred in applying an incorrect standard when considering the sufficiency of [the] affidavits." *Id.* ¶ 55. Our supreme court found the lower courts had erred in "employing a standard that requires evidence of total vindication or exoneration to support a claim of actual innocence" (*id.*) by "erroneously premis[ing] its decision on a 'conflicting evidence' standard" (*id.* ¶ 57), and because the lower courts erroneously "believed that the evidence in the supporting affidavits was positively rebutted simply because it was contradicted by the evidence presented at trial" (*id.* ¶ 60). The correct standards and analytical framework (see *id.* ¶ 61) do not employ a "total vindication or exoneration standard" but instead only require that the evidence "tend[ ] to significantly advance" the claim of actual innocence. (Internal quotation marks omitted.) *Id.* ¶ 55. "[T]he new evidence supporting an actual innocence claim need not be entirely dispositive to be likely to alter the result on retrial. [Citation.] Rather, the conclusive-character element requires only that the petitioner present evidence that *places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt*." (Emphasis added.) *Id.* ¶ 56. The new evidence cannot be "positively rebutted" by the record, but the analytical framework for that determination is not whether the newly discovered evidence "was contradicted by the evidence presented at trial." *Id.* ¶ 60. Instead, at the leave to file a successive petition phase of proceedings, this standard requires that "it must be clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible." *Id.* Viewing the newly discovered evidence this way, then, "[i]n assessing whether a petitioner has satisfied the low threshold applicable to a colorable claim of actual innocence, the court considers only whether the new evidence, if believed and not positively rebutted by the record, could lead to acquittal on retrial." *Id.*

¶ 27 The only evidence in support of petitioner's successive postconviction petition at issue in this case is Niles's affidavit. Given its importance, we set out the affidavit in its entirety:

"I, Lino Niles do hereby declare & affirm that the following information within this affidavit is true and correct in substance and in facts:

To whom it may concern I submit this affidavit in the form of a letter asking that it be taking as being true on the merits of my reasons of which I sincerely apologize for, or me including Droopy/Ahmad Simms in the case of which I committed murder. Some say that people do things out of fear because of the surrounding circumstances of those events [unreadable/stricken] taken place. I on the other hand chose differently and act simply out of 'revenge', and told the police that Droopie/Ahmad was with me when I did the murder-home invasion-armed robbery. I included him because I thought when police took guys to the police station in a sweep off my block and question'd them, that Droopie/Ahmad Simms was with the guys tellin [*sic*] the police about me[,] knowing that I didn't mess with nobody else on that block but him at that time. And Yes I considered Droopy at that time my best friend and felt that it was the ultimate betrayal for him to tell on me [unreadable] one I trusted other than myself out on these streets.

However Droopie/Ahmad Simms knew about what happened just like everybody else because it happened in the hood. I just lied about certain things that whereas he really cared not to know. But I never told him I was the one who did it in no shape form or fashion, I just told him that I needed his help in selling some stuff so that I could get some money in my pocket. In the end the fact of the matter is, I lied to the police about Droopie/Ahmad Simms being involved to shift the blame from myself by all means possible. Even to the point where I took the police where he would spend the night before his mother would come & pick him up to go back home out the city. I told police he had the gun and that he had some of the stuff that I took out of the [apartment] hoping in the end by me doing so that I would be able to walk free or at least do a little time. But coming t [*sic*] the conclusion of things after everything was put on the table *** now realize in all my effortless rationale attempts that I actually caused an innocent person to be locked up who had absolutely no involvement whatsoever. I know I have surely lost a friend but one thing for sure that I will not lose is 'my dignity' to do right as a man, no matter how long it has taken me to say the truth or will take me to say the truth.

I am truly sorry for getting Droopie locked up and I accept full responsibility of my actions in doing so. For my selfish means and ways of being free I even witness'd my sacrifices getting afflicted upon Droopie/Ahmad Simms by the police and know that the police had believed everything that I told them to the point they would go to those extreme measures just to get to the truth even if it wasn't the truth. I also apologize for him going through that physical abuse and any other abuse he may had or have suffered. I don't know in the end of what would be the outcome of me now admitting to the murder but just know that me and my other co-defendant Curtis King was the only two involved. Whether you believe me or not, and I'm not trying to be disrespectful when I say this, 'is totally up to you.' Am so in the event of everything that I've admitted to, not reaching [unreadable] hands of Droopie/Ahmad Simms in time. I just want to go on record and said that I'm sorry for getting you locked up and I hope that you can find it within your heart to forgive me if this [unreadable].

Pursuant to 28 U.S.C. 1746, 18 U.S.C. 1621 or 735 ILCS 5/1-109, I declare under penalty of perjury, that everything contained herein is true and accurate to the best of my knowledge and belief. I do declare and affirm that the matter at hand is not taken either frivolously or maliciously and that I believe the foregoing matter is taken in good faith."

¶ 28 Our first task is to determine whether these statements are positively rebutted by the record. To make that determination we must ask whether it is "clear from the trial record that no fact finder could ever accept the truth of [this] evidence." *Id.*

¶ 29 To aid our determination we first pull from Niles's affidavit what Niles actually says about defendant's "actual innocence" of the crimes for which he was convicted, Niles's affidavit avers about defendant that:

(1) Niles acted out of revenge when he told police defendant was with him when Niles committed the murder, home invasion, and armed robbery. (However, Niles did not say that defendant was not with him when Niles committed the murder, home

invasion, and armed robbery. Niles could mean he acted out of revenge in revealing defendant's participation.)[2]

(2) Niles "included" defendant because Niles thought defendant was informing the police about Niles. (What Niles thought defendant was telling police about him is admittedly unclear.)

(3) Defendant knew about the crime "just like everybody else." (Niles does not say this is the only reason defendant knew about the crime, and as will be revealed later in Niles's affidavit, neighborhood gossip was not the only reason defendant knew about the crime.)

(4) Niles lied to defendant about "certain things" that defendant did not want to know. (What things Niles lied about is unknown.)

(5) Niles never told defendant he (Niles) "was the one who did it"; Niles only told defendant Niles needed defendant's help to sell some things. (Did what, exactly is open to interpretation: it might mean firing the fatal shot. Niles may have told defendant he needed defendant's help to sell the things they planned to take from Irving together.)[3]

(6) Niles lied to police about defendant being "involved." (Niles does not say what involvement, or level of involvement, he lied about. He may mean he lied about defendant having any involvement, or any involvement in the execution of any discrete element of the crime, leaving open the possibility of defendant's "involvement" in any portion of the crime from its planning to the disposal of its proceeds.)

(7) Niles told police defendant had the gun and some proceeds from the crime to downplay his own culpability. (We note that Niles's motive for pointing police in defendant's direction does not exonerate defendant.)

(8) Niles caused an "innocent" person to be locked up because defendant "had no involvement whatsoever." (Niles does not say what, exactly, defendant is "innocent" of. And again, "involvement" in *what* is left vague. Defendant may have had no "involvement whatsoever" in the decision to pull the trigger or in physically taking the proceeds of the robbery and still assisted Niles to gain entry for the purpose of taking the items Niles told defendant he needed to sell to get some money in his pocket.)

---

[2]Notably, in *Edwards*, our supreme court considered whether the petitioner in that case set forth a colorable claim of actual innocence or, "[i]n other words, did [the] petitioner's request for leave of court and his supporting documentation raise the probability that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence," where the petitioner relied on the affidavit of a codefendant who averred the petitioner " 'had nothing to do with this shooting' and was neither 'a part [of nor] took part in this crime.' " *Edwards*, 2012 IL 111711, ¶¶ 31, 39. Our supreme court found the affidavit did not raise the probability that, in light of that new evidence, it is more likely than not that no reasonable juror would have convicted the petitioner because the evidence was "not 'of such conclusive character that it would probably change the result on retrial' " *Id.* ¶ 40. Our supreme court noted that the petitioner "critically [did] not assert that [the] petitioner was not present when the shooting took place" and the affiant's "averment in his affidavit that he was the principal offender 'does little to exonerate [the] defendant who *** was convicted of the murder under the theory of accountability.' " (Emphasis omitted.) *Id.* ¶ 39.

[3]To be accountable, defendant had to intentionally help plan or commit the crimes "either before or during the commission of [the] offense[s]." 720 ILCS 5/5-2(c) (West 2016).

(9) "I don't know in the end of what would be the outcome of me now admitting to the murder but just know that me and my other co-defendant Curtis King was the only two involved." (Niles does not unequivocally state that only he and King robbed Irving's apartment or murdered her or that defendant committed no crimes related to the offenses. Niles notably did not mention the robbery and home invasion.)

¶ 30    We note again the trial court convicted defendant of first degree murder on the basis of accountability, home invasion, and armed robbery. The following evidence of those crimes pertinent to our current inquiry was adduced at defendant's trial. According to Parks's testimony, the offenders gained entry to Irving's building through the basement door. The crime occurred between 11 a.m. and 2 p.m. According to witness Raymond Orange's testimony, at around 1:15 p.m. on the day of the murder defendant and Niles walked out of Irving's building, walked to the garbage, and returned to Irving's building. One of them had something under his arm. According to Jimmy Minter's testimony, defendant and Niles came to Minter's auto shop located just two buildings north of the scene of the crime sometime after 3 p.m. on the day of the crime. Minter testified a pry bar was missing from his toolbox that afternoon. Defendant sold Minter a VCR. Niles was in possession of a bag of coins and a purple attaché case. Parks testified that coins, a VCR, and maroon attaché case were missing from Irving's apartment.

¶ 31    Detective Baker testified the basement door, the door to Irving's apartment, and the door to the second-floor apartment were damaged.

¶ 32    Additionally, defendant gave two statements to police, both of which were substantially the same. In the first statement, defendant told police he saw Niles at Minter's auto shop on the morning of the murder, and Niles told defendant that Niles had been stalking Irving because Irving had won the lottery. Defendant and Niles went to Irving's home. Defendant had a pry bar, and Niles had a gun. Defendant told police that the basement door to Irving's home looked like Niles had previously tried unsuccessfully to pry open the door. Defendant and Niles then broke the basement door open and entered. Defendant told police he and Niles went upstairs, pried open the foyer door, and entered Irving's apartment. Defendant told police that Irving started screaming and Niles put a pillow over her face and shot her in the head. Defendant then grabbed the VCR and other items, while Niles took coins and anything else he could find. According to defendant's statement, he then took the VCR and a television outside and then returned to the apartment. When defendant returned, Niles told defendant to try to get into the second-floor apartment. Defendant tried, but he and Niles fled when he heard noises outside. Defendant told police he and Niles took the contraband to the auto shop, where defendant sold the VCR and television to Minter. Niles told defendant to dispose of the gun. Defendant took a bus to his aunt's home, where he sold the gun on the street.

¶ 33    Assistant State's Attorney Thomas Darman testified that he interviewed defendant on December 2, 1999, and defendant told him a similar version of events that he told Baker. After Darman interviewed King, he spoke with defendant again. Defendant told him the same version as before, except now he included that King served as a lookout. King also helped them remove items from the apartment.

¶ 34    In assessing whether the evidence in support of the successive postconviction petition is positively rebutted by the evidence adduced at trial, we make the following observations:

(1) Based on the timeline and positive identification, Orange testified defendant was with Niles when Niles committed the murder, home invasion, and armed robbery.

- 9 -

(2) Niles's statement as to why he informed police about defendant is not a fact that can be refuted.

(3) There is evidence in the record defendant knew about the crime because he participated. Orange testified defendant was present. Minter testified defendant sold him proceeds from the robbery. Orange's statement is consistent with the statement defendant gave police, and defendant's statement is consistent with the physical condition of the doors in Irving's building.

(4) Niles's statement that he lied to defendant about "certain things" is not a fact that can be refuted.

(5) What Niles did or did not tell defendant is not refuted.

(6) Niles's statement that he lied to police about defendant being "involved" is not a fact that can be refuted.

(7) Niles's statement as to why he informed police about defendant is not a fact that can be refuted.

(8) Niles's statement that defendant is "innocent" and that Niles lied to police about defendant being "involved" is not refuted.

(9) Niles's statement that he and King were the only two "involved" is not refuted.

¶ 35 Under the *Robinson* standard, we find the newly discovered evidence in Niles's affidavit is *not* positively rebutted by the record. While there are contradictions between the averments in the affidavit and the trial evidence, contradictions are not enough to cause defendant to fail this part of the test "because recognizing the existence of a conflict with the trial evidence is not the same as finding that the new evidence is positively rebutted." On the contrary, nothing in the trial record makes Niles's averments "incontestably *** false or impossible." *Robinson*, 2020 IL 123849, ¶ 60. As stated above, we recognize the indefiniteness in many of Niles's averments. For example, Niles's statement that defendant is "innocent" and that Niles lied to police about defendant being "involved" is not necessarily exonerating without knowing what Niles believes defendant is "innocent" of (The murder? The home invasion? The robbery? All of the above?) or what Niles allegedly lied about defendant being involved in. (For example, Niles could plausibly mean "involved" in the murder but not that he lied about defendant being "involved" in the home invasion and robbery.) That is of no matter at the leave to file stage of postconviction proceedings at which "all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true." *Id.* ¶ 45; *Sanders*, 2016 IL 118123, ¶¶ 37, 42 ("credibility is not an issue at the second stage of postconviction proceedings"); see also *People v. Coleman*, 183 Ill. 2d 366, 380 (1998) ("when a petition is filed invoking the act, the trial court shall examine the petition with a view to determining whether the allegations of fact, liberally construed in favor of the petitioner, and taken as true, make a showing of imprisonment in violation of the Federal or State constitution" (internal quotation marks omitted)). Finally, "[i]n deciding the legal sufficiency of a postconviction petition, the court is precluded from making factual and credibility determinations." *Robinson*, 2020 IL 123849, ¶ 45.

¶ 36 Next, we must determine whether that new evidence is of such conclusive character that "it would probably change the result on retrial." *Edwards*, 2012 IL 111711, ¶ 32. In assessing whether defendant "has satisfied the low threshold applicable to a colorable claim of actual innocence," we may ask "only whether the new evidence *** could lead to acquittal on retrial."

- 10 -

*Robinson*, 2020 IL 123849, ¶ 60. To answer that question, "we ascertain whether the supporting affidavits raise the probability that it is more likely than not that no reasonable juror would have convicted [defendant.]" *Id.* ¶ 61.

¶ 37     In this case, under the *Robinson* standard, we find that Niles's affidavit constitutes conclusive evidence that would probably lead to a different result at trial. Niles averred he lied to police about defendant's involvement in the crime, that he and King were the only two people involved in the crime, and, most importantly, that defendant is innocent. Niles's statement that he and King were the only two "involved," although not clear, could be considered exonerating. We cannot say that taking these averments as true, as we must, we think it more likely than not that no reasonable juror would have convicted defendant of these crimes.

¶ 38     Accordingly, defendant has shown that he is entitled to file his successive postconviction petition. The trial court erred when it denied defendant's motion seeking leave to file his successive petition. Therefore, we reverse, and we remand the cause for further proceedings.

¶ 39                                   III. CONCLUSION

¶ 40     For the reasons set forth above, we reverse the judgment of the circuit court of Cook County and remand this case for further proceedings.

¶ 41     Reversed and remanded.