2022 IL App (1st) 210722-U

FIFTH DIVISION
Order filed June 3, 2022

No. 1-21-0722

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No 11 CR 17786 |
| | ) | |
| RICKY SCHOEN, | ) | Honorable, |
| | ) | Kerry M. Kennedy, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE HOFFMAN delivered the judgment of the court.
Presiding Justice Delort and Justice Cunningham concurred in the judgment.

ORDER

¶ 1     Held:  We reversed the circuit court's second stage dismissal of the defendant's postconviction petition and remanded the matter for third stage proceedings where the petition made a substantial showing of actual innocence based on newly discovered evidence and ineffective assistance of trial counsel based on failure to investigate available evidence.

¶ 2     The defendant, Ricky Schoen, appeals from the order of the circuit court granting the State's motion to dismiss his postconviction petition at the second stage of the proceedings. On appeal, the defendant contends that the circuit court erred because his petition made a substantial showing on two claims: (1) a claim of actual innocence based on newly discovered evidence, and

(2) a claim of ineffective assistance of trial counsel based on failure to investigate and call witnesses to impeach the State's motive witness. For the reasons that follow, we reverse and remand the matter to the circuit court for further proceedings.

¶ 3    Following a bench trial, the defendant was found guilty of first-degree murder (720 ILCS 5/9-1(a)(3) (West 2010)) and sentenced to 50 years' imprisonment. The facts of this case are fully set forth in our order disposing of the defendant's direct appeal. *People v. Schoen*, 2017 IL App (1st) 143693-U. We set forth those facts necessary for an understanding of this appeal.

¶ 4    In 2010, there was an ongoing conflict between two rival street gangs, the Almighty Saints and the Latin Kings. In May 2010, a member of the Almighty Saints was shot. On May 25, 2010, a red Ford Explorer (also referred to herein as SUV) drove past a liquor store in Summit, Illinois. A passenger in the SUV fired at two men, Daniel Reynoso, a Latin King, and Oscar Solarzano, who was not affiliated with either gang. Reynoso was not struck, but two bullets struck Solarzano and he died.

¶ 5    A police officer heard information regarding the shooting and began looking for a red Ford Explorer. He found an SUV matching the description headed north near the shooting scene and attempted to stop the vehicle. The vehicle continued driving and did not stop at stop signs along the way. Eventually the vehicle stopped on the 5200 block of Neva Avenue in Chicago. The driver and two passengers exited the vehicle. The driver ran northwest, and the passengers ran east. The officer chased the passengers and was able to apprehend one of them, later identified as Gustavo Garcia. A second suspect identified as Matt LaMotte was apprehended after he was seen running and jumping into a pickup truck. The driver was not apprehended. At trial, the parties stipulated that that the red Ford was owned by David Wheeler.

¶ 6     According to the State's theory of the case, the defendant was the driver of the red Ford. The State supported its theory with the testimony of the defendant's brother, David Wheeler. At the defendant's trial, Wheeler testified that, in May 2010, the defendant had just gotten out of jail and was living with him in Joliet. He helped the defendant get a phone, found him a job working in maintenance at the apartment complex where they lived, and bought him some clothes. Wheeler testified that the defendant was a member of the Almighty Saints and had tattoos on his arms and face reflecting his membership. Wheeler owned the red Ford SUV and the defendant had ridden in the SUV numerous times.

¶ 7     Wheeler further testified that, on May 25, 2010, he worked until approximately 7 p.m. When he got back to his apartment, the defendant was there "cleaning up" after work. The defendant planned to go out that night. Wheeler advised the defendant not to go out, but he did not listen and left. Wheeler showered, ate, and went to sleep early. Between 10:30 and 11 p.m., the defendant called Wheeler and told him to report his SUV as stolen. According to Wheeler, the defendant sounded "very panicked, frantic, out of breath." Wheeler testified he looked out a window and saw that his SUV was not in his assigned space. He called the Joliet police and reported his vehicle as stolen. The Joliet police took Wheeler's information and told him an officer would meet him to take a report. Wheeler stated that he called the defendant and told him that he had made a report and was expecting an officer. The defendant told him to make the report and call him back when it was done.

¶ 8     Wheeler testified that a police officer met him outside his apartment and took information about the SUV. The officer asked Wheeler to go back to his apartment and look for his keys to the

vehicle. Wheeler looked for his keys and discovered that they were not where he left them. He told this to the officer. The officer completed the report, and Wheeler went back to his apartment.

¶ 9 According to Wheeler, after he got back to his apartment, the defendant called him, and told him "some vague details" about borrowing his truck and hoping to have it back before he woke up. The defendant said that he was out with some friends and another vehicle pulled up next to him, words were exchanged, he shot someone, and had to leave Wheeler's SUV.

¶ 10 Wheeler added that, at approximately 3 a.m., police officers came to his apartment and took him to the police station in Bedford Park. Wheeler said he "stuck with" his story about his SUV being stolen. Wheeler admitted that, when he did so, he was lying. The police gave Wheeler a ride back to his apartment. While driving back, the defendant called Wheeler. The police asked Wheeler not to tell the defendant he was with them and find out where the defendant was located. Wheeler told the defendant, he was in a cab riding home to his apartment, but the defendant would not tell him where he was. Wheeler returned to his apartment.

¶ 11 Wheeler testified that, a day or two later, the defendant returned to the apartment, gathered some clothing, and left. Wheeler added he has not seen the defendant since then. Wheeler stated that, in June 2011, the police came to his apartment a second time and took him to the police station to answer questions, and he "came clean."

¶ 12 Edwin Rolnicki testified that he was member of the Almighty Saints in May 2010. The defendant, LaMotte, and Garcia were also members of the gang. In May 2010, another member of the gang, Michael Gallardo was shot. Another member's brother was also shot. After the shootings, the defendant called a meeting of the gang at LaMotte's house. According to Rolnicki, the defendant was upset about the shootings and said something needed to be done about it. He said

that a Latin King had to die. A gang member known as "Blue" or Gary confronted the defendant, and the defendant punched him in the mouth.

¶ 13    The State also supported its theory of the case with forensic evidence. Forensic investigators recovered a black hairnet in the SUV that had a DNA profile from which the defendant could not be excluded. Forensic investigators also discovered finger and palm prints matching the defendant on the driver's side door handle and driver's side mirror on the SUV. A special agent with the Federal Bureau of Investigation (FBI) testified regarding forensic cell-site analysis. The analysis showed that, at the relevant time, a cellular phone associated with the defendant was used in the "general vicinity" of the murder and then moved north.

¶ 14    After the State rested, the defendant did not testify or present any evidence. Following closing arguments by the parties, the trial court found the defendant guilty of first degree murder and subsequently sentenced the defendant to fifty years' imprisonment. The defendant appealed and this court affirmed his conviction and sentence. *Schoen*, 2017 IL App (1st) 143693-U.

¶ 15    On December 22, 2017, the defendant filed a petition for postconviction relief. The petition argued that the defendant was actually innocent and that he was denied the effective assistance of counsel.

¶ 16    The defendant supported his actual innocence claim with the affidavit of LaMotte who averred that, on the night of the murder, the defendant was at his (LaMotte's) home. Garcia asked the defendant for a ride home, but the defendant was drunk and declined. LaMotte averred that, instead, Joaquin Rocha offered to give Garcia a ride home in the defendant's brother's SUV. Rocha drove and LaMotte and Garcia were passengers. As they were driving to Garcia's home, LaMotte heard a man on a bicycle say "what's up," then he heard gunshots. Following the gunshots, Garcia

pulled out a handgun and began firing "aimlessly." They drove a short distance. LaMotte was still hearing gunshots, and Garcia stuck his arm out the window and fired one more shot. LaMotte further averred that Rocha drove away, spotted a police car, and began driving faster. Eventually, Rocha stopped the SUV, and all three ran.

¶ 17    The defendant also supported his actual innocence claim with the affidavit of Rachel Bottari, his girlfriend. She averred that, after speaking with family members, she called Wheeler and spoke with him. According to Bottari, Wheeler told her that he lied during the defendant's trial, and that he does not know what happened on the night of the murder. Bottari averred that Wheeler said he lied because the police threatened to charge him with the murder. Bottari also averred:

> "Although I was [*sic*] did not personally speak to Ricky's trial attorney, I know from Ricky, that he told his trial attorney about a couple of people that had information about his case. Ricky told his attorney about Jennifer and Gary Schweig ("Blue"), who could testify about why Ricky and Gary fought at the party at the [*sic*] LaMotte's house a few weeks before the shooting."

¶ 18    The defendant also argued that he was denied the effective assistance of counsel when trial counsel failed to investigate and call as witnesses Gary[1] and Jennifer Schweig. The defendant supported his claim with affidavits from Gary and Jennifer. Each averred that they were at a party with the defendant on May 17, 2010, and that Gary and the defendant fought during the party. However, they both averred that the fight was about the defendant drinking and using marijuana and that Gary confronted him because he was concerned he would violate his parole.

---

[1] Gary is also spelled as Garry at various points in the record.

¶ 19    On February 27, 2020, the defendant filed an amended petition for postconviction relief. Along with other arguments, the amened petition repeated the allegations regarding actual innocence and the claim of ineffective assistance of counsel. The amended petition argued that trial counsel should have discovered the Schweigs' testimony stating:

> "Had counsel conducted reasonable investigations he would asked his client who was present at the party, who was 'Blue,' and he would have interviewed those people because he was on notice that the party was relevant to the State's case."

¶ 20    On August 7, 2020, the State moved to dismiss the defendant's postconviction petition. The defendant filed a response, and the State filed a reply. The circuit court held that there was no substantial showing of a constitutional violation and granted the State's motion. This appeal follows.

¶ 21    The Act provides a procedure whereby a person in the penitentiary may assert that his conviction was the result of a violation of the federal or state constitution. 725 ILCS 5/122-1 *et seq.* (West 2020); see also *People v, Ruddock*, 2022 IL App (1st) 173023, ¶ 44. Proceedings under the Act are a collateral attack on a final judgment; they are not a substitute for a direct appeal. *People v. Edwards*, 2012 IL 111711, ¶ 21. Proceedings under the Act have three stages. *Ruddock*, 2022 IL App (1st) 173023, ¶ 44. If a postconviction petition survives summary dismissal at stage one and is not dismissed on the State's motion at stage two, the circuit court conducts a stage-three evidentiary hearing. *Id.*

¶ 22    At the second stage the circuit court does not engage in fact-finding or credibility determinations. *People v. Dupree*, 2018 IL 122307, ¶ 29. Such determinations are made at the evidentiary hearing stage. *Id.* Any allegations not affirmatively refuted by the record are taken as

true. *Id.* "Thus, the substantial showing of a constitutional violation that must be made at the second stage is 'a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, which if proven at an evidentiary hearing, would entitle petitioner to relief.' " *Id.* (quoting *People v. Domagala*, 2013 IL 113688, ¶35). We review a second-stage dismissal *de novo*. *Id.*

¶ 23    For his first assignment of error, the defendant contends that the circuit court erred when it held that the defendant's postconviction petition did not make a substantial showing of actual innocence.

¶ 24    "To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial." *People v. Robinson*, 2020 IL 123849, ¶ 47. Evidence is newly discovered if it was discovered after trial and the petitioner could not have discovered it earlier through the exercise of due diligence. *Id.* Material evidence is evidence that is relevant and probative of the petitioner's innocence. Evidence is noncumulative if it adds to the information that the fact finder heard at trial. *Id.* Evidence has a conclusive character if, when considered along with the trial evidence, it would probably lead to a different result. *Id.* The final element, the conclusive character, is the most important. *Id.* (citing *People v. Washington*, 171 Ill. 475, 489 (1996)). "To this end, 'all well pleaded facts that are not positively rebutted by the record are taken as true.' " *People v. Simms*, 2021 IL App (1st) 161067-B, ¶ 21 (quoting *People v. Harper*, 2013 IL App (1st) 102181, ¶ 38).

¶ 25    Initially, we note that LaMotte's affidavit must be treated as new evidence, because he was a codefendant who had a right to avoid self-incrimination as guaranteed by the fifth amendment

of the United States Constitution (U.S. Const., amend. V) and no amount of diligence could have forced him to testify unless he chose to. See *Simms*, 2021 IL App (1st) 161067-B, ¶ 23. We also find that the affidavit constitutes newly discovered evidence. It was obtained after trial and there is no indication in the record that the defendant could have obtained it earlier. See *Robinson*, 2020 IL 123849, ¶ 47. Here, as in *Simms*, the affidavit is material and noncumulative. See *Simms*, 2021 IL App (1st) 161067-B, ¶ 23. The allegation that the defendant was not driving is relevant to the issue of his guilt, and it is not cumulative because no one testified at trial that he was not in the SUV at the time of the shooting.

¶ 26    We turn next to the question of whether the affidavits are so conclusive they would probably change the result on retrial. We cannot conclude that the trial court would have convicted the defendant if it had been presented with credible testimony that the defendant was not in the SUV at the time of the shooting. The State counters arguing that we need not accept the affidavit as true because it is positively rebutted by the record. See *People v. Sanders*, 2016 IL 118123, ¶ 42. We disagree.

¶ 27    The State argues that the affidavit is rebutted by Wheeler's testimony that the defendant admitted being in the SUV at the time of the shooting and actually firing a weapon. First, we note that *Robinson* informs us that evidence is not affirmatively rebutted simply because it conflicts with the evidence presented at trial. *Robinson*, 2020 IL 118123, ¶ 57. Although Wheeler testified that the defendant admitted to being in the SUV, LaMotte's affidavit directly rebutted that claim. Which version of events the trial court would accept on retrial is entirely a matter of credibility and credibility determinations are inappropriate prior to a third-stage evidentiary hearing. See *id.* ¶ 61. Moreover, the defendant also presented the affidavit of Bottari, in which she averred that

Wheeler admitted lying during the defendant's trial. Again, we note that the question of whether Bottari or Wheeler is more credible is reserved for a third-stage hearing.

¶ 28    Finally, the State argues that the forensic cell-site evidence corroborated the defendant's presence near the scene of the murder and the motive evidence supported his identity as one of the people involved. We simply note that cell-site evidence could only place the defendant's phone within the "general vicinity" of the crime. Furthermore, although the motive evidence supports the State's theory of the case, it does not directly rebut the allegations in LaMotte's affidavit. Therefore, we conclude that the defendant's amended petition made a substantial showing of a claim of actual innocence, and that claim should proceed to a third-stage evidentiary hearing.

¶ 29    For his second assignment of error the defendant contends that his trial counsel was ineffective because he failed to investigate and present the Schweigs as witnesses to refute Rolnicki's testimony about the gang meeting.

¶ 30    When, as in this case, a defendant alleges ineffective assistance of counsel, we apply the two-prong test articulated by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Velasco*, 2018 IL App (1st) 161683, ¶ 138. A defendant must establish that (1) trial counsel's representation fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different. *People v. Enis*, 194 Ill. 2d 361, 376 (2000) (citing *Strickland*, 466 U.S. at 694); see also *Domagala*, 2013 IL 113688, ¶ 36. "A reasonable probability is a probability sufficient to undermine confidence in the outcome, namely, that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair." *Enis*¸ 194 Ill. 2d at 376. A defendant must also overcome the strong presumption that any challenged action or inaction may

have been the product of trial strategy. *People v. Dupree*, 2018 IL 122307, ¶ 44. The failure to satisfy either prong of the Strickland test is fatal to a defendant's claim. *Enis¸* 194 Ill. 2d at 377.

¶ 31    Decisions regarding what evidence to present and which witnesses to call are matters of trial strategy. *People v. Williams*, 2017 IL App (1st) 152021, ¶ 38. Counsel, however,  has a duty to make reasonable investigations or to make a reasonable decision that an investigation into a particular source of evidence is unnecessary. *Id.* (citing *People v. Pecoraro*, 175 Ill. 2d 294, 324-25 (1997)). If an attorney has made a thorough investigation of the law and facts, then his or her strategic choices are "virtually unchallengeable." *People v. Towns¸* 182 Ill. 2d 491, 514 (1998).

¶ 32    Here, Bottari's affidavit averred that the defendant told trial counsel that Gary and Jennifer were present at the alleged gang meeting and would have testified that the fight was not about gang retaliation. If this evidence had been presented and found credible by the trial court, it would have refuted Rolnicki's testimony that the defendant fought Gary because he was angry and wanted to retaliate against Latin Kings. The record contains no strategic reason for failing to present such testimony. Therefore, we cannot conclude that the failure to investigate and present their testimony was a matter of trial strategy.

¶ 33    The State argues that we should presume that this was a product of sound trial strategy and notes that trial counsel challenged Rolnicki's credibility by cross-examination and arguing that his testimony was uncorroborated. However, there is nothing in this strategy that would have been inconsistent with investigating and presenting the testimony of Gary and Jennifer.

¶ 34    The State further argues that the defendant's claims regarding the failure to use the proposed testimony of Gary and Jennifer did not make a substantial showing of prejudice. However, motive evidence was a key component of the State's case against the defendant. If Gary

and Jennifer had testified, their testimony would have undermined the motive element of the case. Even testimony that would have indirectly supported a defendant's theory of the case can support a finding of ineffective assistance for failure to investigate and present a witness. See *People v. Willingham*, 2020 IL App (1st) 162250, ¶ 56 (holding that the failure to present evidence that gang members were armed would have indirectly supported the defendant's self-defense claim). Therefore, we conclude that the circuit court erred when it held that the defendant's ineffective assistance of counsel claim based on the failure to investigate Gary and Jennifer's testimony did not make a substantial showing of constitutional violation.

¶ 35    For the foregoing reasons, we reverse the order of the circuit court of Cook County dismissing the defendant's postconviction at the second stage and remand the matter for further proceedings on the defendant's claims of actual innocence and ineffective assistance of counsel.

¶ 36    Reversed and remanded with directions.