2022 IL App (1st) 173023

FIFTH DIVISION
Order filed: January 14, 2022

No. 1-17-3023

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 92 CR 20720 (2) |
| | ) | |
| ANDRE RUDDOCK, | ) | Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE HOFFMAN delivered the judgment of the court, with opinion.
Presiding Justice Delort and Justice Rochford concurred in the judgment and opinion.

**OPINION**

¶ 1    The defendant, Andre Ruddock, has appealed from two orders of the circuit court of Cook County. The first order denied his second successive postconviction petition filed pursuant to the Post–Conviction Hearing Act (Act) (725 ILCS 5/122 *et. seq.* (West 2012)) after a third-stage evidentiary hearing on his claim of actual innocence, and the second order denied him leave to file a *pro se* supplemental successive petition under the Act alleging that his 55-year sentence violated

the eighth amendment to the United States Constitution (U.S. Const., amends. VIII, XIV) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. 1, § 11). We affirm.

¶ 2     On May 29, 2020, this court entered an order pursuant to Illinois Supreme Court Rule 23 (eff. April 1, 2018), affirming the circuit court's denial of the defendant's postconviction petition alleging actual innocence; reversing its denial of the defendant's motion for leave to file a *pro se* supplemental successive postconviction petition alleging that his 55-year sentence violated the eighth amendment to the United States Constitution; vacating the defendant's sentence; and remanding the matter to the circuit court for a new sentencing hearing. Having determined that the defendant's 55-year sentence violated the eighth amendment to the United States Constitution, we declined to address the defendant's alternative argument that his sentence violated the proportionate penalties clause of the Illinois Constitution. *People v. Ruddock,* 2020 IL App (1st) 173023, ¶¶ 71-72. On December 29, 2021, the supreme court entered a supervisory order directing this court to vacate its May 29, 2020 judgment and reconsider our decision in light of the decision in *People v. Dorsey,* 2021 IL 123010. For the reasons that follow, we now affirm both the circuit court's denial of the defendant's postconviction petition alleging actual innocence and its denial of the defendant's *pro se* motion for leave to file a supplemental successive postconviction petition under the Act alleging that his sentence violated the federal and State constitutions.

¶ 3     The defendant, who was 16 years old at the time, and the codefendant, Rafael Cole[1], were charged with two counts of first-degree murder, conspiracy, attempted first-degree murder, aggravated battery with a firearm, two counts of aggravated battery, and aggravated discharge of

---

[1] The codefendant is, at various times, referred to in the record as Rafael, Raphael, and Ralph.

a firearm in connection with an August 19, 1992 shooting incident that resulted in the death of Octavia King and the injury of Kenyatta Wright.

¶ 4    Following a jury trial held on October 20, 1994, the defendant was convicted of one count of first-degree murder and one count of attempted first-degree murder. The evidence presented at the 1994 trial established that, on the afternoon of August 19, 1992, the defendant approached a group of people standing at a bus stop near the intersection of 74th and Aberdeen. After retrieving a handgun from under his shirt, the defendant fired several shots at the group, striking both of the victims. Wright, who was struck twice, survived. King, who was chased by the defendant and shot again, later died.

¶ 5    During its case in chief, the State relied primarily on the testimony of three juveniles who witnessed the shooting—Terrence Sanders, LaToya Perkins, and Robert Johnson—and Wright, the surviving victim.

¶ 6    Wright testified that the person who shot her had a black gun, but he could not recognize the individual because he wore a mask covering his face.

¶ 7    Sanders, who was 16 years old at the time of the shooting, testified that, shortly before the shooting, he was riding in a vehicle with Vondell Sullivan and Robert Johnson. As they drove eastbound on 74th Street, Sanders saw King, Wright, Perkins, and another girl waiting at the bus stop at the intersection of 74th and Aberdeen. The car in which Sanders was riding turned down Aberdeen, where they encountered the defendant; the codefendant, Cole; and David Evans. According to Sanders, Cole entered the vehicle and asked if anyone knew why King had been inquiring as to where he lived. Cole then announced that he was going to kill King. The defendant, who was standing just outside of the vehicle, responded to Cole's comment by stating that he was

going to kill King instead. The defendant and Cole proceeded to argue over who was going to shoot King. Sanders testified that he left the car shortly thereafter and proceeded to walk home. While walking home, he witnessed the shooting. According to Sanders, he recognized the defendant as the shooter because of the shoes he was wearing and the way he was walking. On cross-examination, Sanders admitted that he was currently facing criminal charges in Michigan for being an accessory to murder and carrying a concealed weapon. Sanders also admitted that he had lied to the police investigating those offenses but later changed his story. He testified that the Cook County State's Attorney had not agreed to intervene in the Michigan case on his behalf.

¶ 8    Johnson, who was 12 years old at the time of the shooting, testified next. Johnson described seeing an unknown individual with a shirt over his face near 74th Street, and shortly thereafter, he heard several shots being fired. He testified that he could not identify the shooter because he was walking in the other direction when he heard the shots fired. Johnson denied that he was in a vehicle with Sanders and Sullivan shortly before the shooting. He also denied hearing the defendant say that he was going to shoot King or that he saw the defendant shoot at a group of people. Rather, Johnson testified that he saw the defendant near 73rd and Aberdeen, but he was not with Johnson's group.

¶ 9    Following Johnson's testimony, the circuit court permitted the State to admit, as substantive evidence pursuant to section 115-10.1 of the Code of Criminal Procedure (725 ILCS 5/115-10.1 (West 1994)), Johnson's prior written statement and grand jury testimony. Johnson's written statement corroborated Sanders' account of the events preceding the shooting and also described a conversation that he heard between the defendant and Cole, during which the defendant agreed to shoot Wright and King. According to the written statement, Johnson also heard Cole tell

the defendant to wrap a white shirt around his face so that no one could recognize him. Johnson's grand jury testimony was substantially consistent with his written statement. At the trial, Johnson testified that he made these prior statements because the police coerced him into naming the defendant as the shooter.

¶ 10    Perkins testified that she was at the bus stop at 74th and Aberdeen when an individual approached the bus stop and shot at King and Wright. She testified that the shooter stood two feet away from her when he started shooting. She stated that, although the shooter had a white t-shirt over his face, she recognized the defendant's eyes and the jeans, underwear, and shoes that he was wearing from when she saw him earlier in the day. Perkins testified that she had known the defendant since the seventh grade. According to Perkins, she spoke with the defendant on the phone several times after the shooting, and during one of these calls, he threatened to kill her if she "went to court." Perkins testified that her friend, Francesca Silas, was on the first phone call with the defendant. On cross-examination, Perkins acknowledged that, in 1993, she had been hospitalized intermittently in a psychiatric ward.

¶ 11    After the State rested, the defense called Silas, who testified that she had known Perkins for four years, and in October of 1993, Perkins asked her to call the defendant. According to Silas, Perkins was in the psychiatric ward of a hospital at that time of the call. Silas testified that she called the defendant on a three-way line, listened to the conversation, and heard no threats from the defendant. She stated that she only listened in on one conversation between Perkins and the defendant and that Perkins could not have called the defendant again on her own because she did not have his phone number.

¶ 12    The defendant testified on his own behalf. He testified that, at the time of the shooting, he was in his foster home at 77th Street and Marshfield until around 4:30 p.m. and then went to his girlfriend's house at 76th Street and May. He denied being in the neighborhood of 74th and Aberdeen on the day of the shooting. He acknowledged that he had once dated Perkins but testified that he did not see her after he moved out of the neighborhood and had spoken to her only once since his arrest. He denied ever discussing the shooting with her or threatening her.

¶ 13    At the close of the evidence, the jury found the defendant guilty of the first-degree murder of King and the attempted murder of Wright. On November 29, 1994, the court sentenced the defendant to concurrent terms of 55 and 15 years' imprisonment, respectively.

¶ 14    On direct appeal, we affirmed the defendant's convictions and sentences, and rejected his contention that several instances of prosecutorial misconduct deprived him of a fair trial. *People v. Ruddock,* No. 1-96-2923 (1997) (unpublished order under Supreme Court Rule 23).

¶ 15    On November 25, 1997, the defendant filed a *pro se* postconviction petition pursuant to the Act, alleging 14 separate constitutional violations, including, *inter alia*, newly discovered evidence of actual innocence in the form of an alibi witness. The circuit court summarily dismissed the defendant's petition, and we affirmed that decision on appeal. *People v. Ruddock*, No. 1-98-1409 (1999) (unpublished order under Supreme Court Rule 23).

¶ 16    On December 1, 2003, the defendant filed a combined *pro se* postconviction petition for relief from judgment under the Act (first successive postconviction petition) and under section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2002)). In his petition, the defendant alleged the following: his conviction was obtained by using the perjured testimony of Sanders and Perkins; the State withheld exculpatory evidence regarding Sanders, including an

agreement with prosecutors to intervene in a pending case; and newly discovered evidence demonstrating his actual innocence.

¶ 17    Attached to the defendant's petition was an affidavit from Sanders in which he stated that he testified falsely at the defendant's trial because the prosecutor told him that, if he gave "convincing testimony" at the defendant's trial, he would "receive leniency" on charges that were then pending against him in Michigan. Sanders further stated that he came forward with this information because he could no longer live with the knowledge that he had helped convict an innocent person.

¶ 18    On January 20, 2004, the circuit court summarily dismissed the defendant's first successive postconviction petition, stating that it was "an untimely, improper successive post-conviction petition barred in part by *res judicata* and regardless patently frivolous and without merit in its substantive allegations." On appeal from that ruling, we affirmed the dismissal of the claims contained in the defendant's first successive postconviction petition but reversed the dismissal of the requests for relief from judgment pursuant to section 2-1401 of the Code. *People v. Ruddock*, No. 1-04-0983 (2005) (unpublished order under Supreme Court Rule 23).

¶ 19    On remand, the State filed a motion to dismiss the defendant's section 2-1401 petition, asserting that it was untimely and failed to satisfy the substantive requirements of due diligence. The circuit court agreed and dismissed the petition. The defendant appealed from that order, and we affirmed. *People v. Ruddock*, No. 1-06-3762 (2008) (unpublished order under Supreme Court Rule 23).

¶ 20    On June 26, 2007, the defendant asked the court for leave to file his second combined petition, which asserted claims under the Act (second successive postconviction petition) and

section 2-1401 of the Code. Relevant to this appeal, the defendant's second successive postconviction petition raised a claim of actual innocence. In support of his claim, the defendant attached the previously filed affidavit of Sanders. He also attached four additional affidavits, all prepared in 2004, which included affidavits from Josh Herron, Cortez Wraggs, and David Evans.

¶ 21 The State filed a motion to dismiss the defendant's section 2-1401 petition, arguing, *inter alia*, that the petition was untimely and the defendant failed to demonstrate legal disability, duress, or fraudulent concealment. On September 24, 2007, the circuit court denied the defendant leave to file a second successive postconviction petition under the Act and granted the State's motion to dismiss his section 2-1401 petition. In denying the defendant leave to file a successive postconviction petition, the court found that he failed to establish why the affiants were previously unavailable and that the affidavits failed to demonstrate prejudice to the defendant. The court also held that Evans's admission that he committed perjury when he testified before the grand jury was untimely, unsupported, and unlikely to change the result on a retrial.

¶ 22 The defendant appealed the circuit court's denial of leave to file his second successive postconviction petition, arguing that the affidavits of Herron and Wraggs raised an arguable claim of actual innocence. We agreed, vacating the circuit court's denial of the defendant's motion for leave to file the second successive postconviction petition and remanding the matter for further proceedings under the Act. *People v. Ruddock*, No. 1-07-2818 (2010) (unpublished order under Supreme Court Rule 23).

¶ 23 On remand, counsel for the defendant was appointed, and he filed a supplemental petition for postconviction relief on February 15, 2012, attached to which were the affidavits of, *inter alia*,

Evans and Wraggs, both alleging that they witnessed the shooting and that they would testify that Cole, not the defendant, was the perpetrator.

¶ 24    Evans's affidavit stated that he observed the shooting and, although the shooter was wearing a mask, he recognized that it was Cole, whom he had known for many years. Evans admitted that he identified the defendant as the shooter to the police and when he testified before the grand jury. According to the affidavit, Evans identified the defendant only because the police beat and threatened him and showed him Cole's statement in which he identified the defendant as the shooter. He explained that he did not come forward earlier with this information because he disliked the defendant when they were younger, but having matured, he realized that no one should be imprisoned for a crime that they did not commit.

¶ 25    Wraggs's affidavit related that, on the day of the shooting, he was on a bench with an individual named Frank just south of 74th and Aberdeen when he heard gunshots. Shortly thereafter, he saw a masked man running in his direction with a silver gun in his hand. Wraggs pointed his own gun at the masked man, and the man removed the mask and said to Frank, "It's me, Ralph." Frank told Wraggs "it was cool" and Wraggs lowered his weapon. Subsequently, in March 2004, Wraggs met the defendant in prison and learned that he had been convicted of the shooting. Wraggs averred that the defendant was not the man with the silver gun he had seen that day.

¶ 26    On September 19, 2012, the State filed an answer and a motion to dismiss the defendant's second successive postconviction petition as supplemented, agreeing that a hearing was required to determine the credibility of Wraggs but asserting that the allegations in the remaining affidavits

should be stricken. On January 24, 2013, the circuit court ruled that it would only allow Wraggs to testify at the third-stage evidentiary hearing.

¶ 27     On October 30, 2013, the parties proceeded to a third-stage evidentiary hearing. Wraggs's testimony at the hearing was consistent with the information contained in his affidavit; although during his testimony, he was unable to recall the exact date of the shooting. After Wraggs testified, the defendant asked the circuit court to reconsider its decision regarding Evans, requesting that he be allowed to testify or that the court consider his affidavit when determining the credibility of Wraggs. The court denied the request. The parties stipulated that, if called, Chicago Police officers would testify that they signed a case report indicating two witnesses saw the offender flee to the south. The parties also stipulated to a certified record showing that Cole was convicted of conviction for conspiracy and two counts of attempted murder arising from the August 19, 1992, shooting, and he was sentenced to 12 years' imprisonment. Cole subsequently died on January 22, 2000.

¶ 28     On January 9, 2014, the circuit court denied the defendant's second successive postconviction petition as supplemented. The court determined that Wraggs was not a credible witness because he testified that the gun was silver when Wright testified at the defendant's trial that the gun was black, and he could not recall the date of the shooting. It also found that his testimony was unlikely to change the result of the case on a retrial because Perkins, who identified the defendant as the shooter at trial, witnessed the shooting firsthand, whereas Wraggs did not. The circuit court also pointed out that Perkins, unlike Wraggs, was a credible witness. It held, therefore, that the defendant failed to make a substantial showing of his actual innocence and denied his postconviction petition.

¶ 29 The defendant appealed, arguing that the circuit court erred when it refused to consider Evans's affidavit or allow him to testify at the third-stage evidentiary hearing. We agreed and reversed and remanded the matter for further postconviction proceedings. *People v. Ruddock*, 2015 IL App (1st) 140200-U. Specifically, we directed the circuit court "to consider the actual innocence claim contained in the defendant's supplemental petition, including all of the supporting affidavits attached thereto, and conduct an evidentiary hearing on the relevant witnesses before ruling upon the petition." *Ruddock*, 2015 IL App (1st) 140200-U, ¶ 41.

¶ 30 On remand, the defendant moved to again supplement his petition; this time, he sought to include an affidavit from Pyreese Wallace. The trial court granted the motion. Wallace's affidavit stated the following. On August 19, 1992, he exited his grandmother's house and saw Cole in the yard putting a t-shirt over his head "in a way that resembled a ninja mask." Cole told him to go back in his house, which he did. From inside the house, Wallace watched Cole exit his gangway and head in the direction of 74th Street, where he walked toward a group of people standing at the bus stop. Wallace saw Cole shoot at King and Wright and then run toward a baseball field. Wallace told his grandmother what he had seen, and she told him to stay in the house and "keep [his] mouth shut." According to Wallace, he "never spoke a word of what [he] saw to anyone outside of [his] family." In March of 2015, he was incarcerated at Centralia Correctional Center in the same wing as the defendant. When Wallace learned that the defendant was incarcerated for the murder of King and the attempted murder of Wright, he laughed and told the defendant that he saw Cole shoot the victims.

¶ 31 On February 10, 2016, the defendant, acting *pro se,* filed a motion seeking leave to file a "Supplemental Petition for Post-Conviction Relief," arguing that his 55-year sentence for a crime

he committed as a juvenile violated both the eighth amendment to the United States Constitution and the proportionate penalties clause of the Illinois Constitution, citing *Miller v. Alabama,* 567 U.S. 460 (2012). On March 16, 2016, the circuit court denied the defendant leave to file his supplemental petition with a written order, finding that *Miller* did not apply to the defendant's *de facto*, rather than natural, life sentence. On April 29, 2016, the defendant filed a *pro se* notice of appeal of the court's denial of leave to file his supplemental postconviction petition. On May 6, 2016, the circuit court entered an order, finding that the *pro se* notice of appeal was filed "prematurely" because "no final judgment had been entered" and ordering that the notice of appeal "shall NOT be transmitted to the appellate court."

¶ 32    On February 22, 2017, a third-stage evidentiary hearing was held on the defendant's actual innocence claim with Wallace and Evans testifying. Wallace testified that he is 33 years old and incarcerated in Centralia Correctional Center for the offense of Armed Habitual Criminal. Wallace also stated that he had been convicted of armed robbery and possession of a controlled substance in 2004 and 2006. Additionally, in 2007, Wallace was convicted of unlawful possession of a weapon by a felon. Wallace testified that, in August 1992, he was 9 years old and lived with his grandmother in the Englewood community. He stated that he "knew of" the defendant because he lived in the neighborhood, but they were not friends.

¶ 33    Wallace testified that, on August 19, 1992, he witnessed a shooting on the corner of 74th and Aberdeen. According to Wallace, he was in his backyard disposing of the garbage when he saw Cole, whom he knew from the neighborhood, tying a white t-shirt over his head. He asked Cole what he was doing in his backyard, and Cole told him to go back inside. Wallace returned inside and he saw Cole going through the gangway. Wallace moved to the front porch and saw

Cole turn right toward 74th Street. He continued watching as Cole crossed 74th Street, approached a group of people, and fired a gun in their direction. After the shooting, Wallace saw Cole flee toward a baseball field that was in the direction of 75th Street. Wallace then ran back into the house and told his grandmother about the shooting. His grandmother told him to stay in the house and not tell anyone about the incident. Wallace testified that he did not see the defendant that day.

¶ 34 Wallace next testified that he encountered the defendant in the Centralia Correctional Center in March of 2015, and they struck up a conversation. He asked what the defendant was incarcerated for, and the defendant told him it was for the murder of King and the attempted murder of Wright. According to Wallace, his first reaction was to laugh because he thought the defendant was lying. Wallace testified that he prepared his affidavit for the defendant two weeks later. On cross-examination, Wallace testified that he never saw Cole again after the shooting and has since heard that Cole passed away. Wallace stated that he was first made aware that the defendant was charged with King's murder when he saw him in prison.

¶ 35 Wallace also responded to questions from the court. He testified that he did not speak about the case with the defendant when they were on the bus coming to court because the defendant told him it was "best" if they did not talk about it. Wallace admitted that he prepared an affidavit at the defendant's request and that the defendant provided him with the last names of several of the individuals mentioned in the affidavit. Wallace asserted that, although he was only nine years old at the time of the shooting, he knew all the individuals involved. He testified that he never talked about the shooting when he was younger because his grandmother told him not to. He stated that he never spoke of the shooting as an adult because no one ever asked him about it and he assumed Cole had been convicted of King's murder.

¶ 36     Evans testified that he is 40 years old and is currently serving a life sentence in the Illinois Department of Corrections for two counts of first-degree murder. He testified that, on August 19, 1992, he saw a shooting on the corner of 74th and Aberdeen. According to Evans, he was standing on the front porch of his girlfriend's house at 7317 South Aberdeen when he first saw a man, whom he identified as Cole, with a gun in his waistband. Evans stated that he had known Cole for five or six years. He testified that he heard someone tell Cole that "[King] was down the street." He then saw Cole go into a house and come out with a white t-shirt in his hands. Cole carried the shirt through a gangway and then re-emerged about 20 houses down with the shirt over his head as a mask. Evans testified that he was sure this person was Cole. He stated, "I seen him continue to walk towards [King], and the crowd down there. And he raised the gun. Eventually started shooting." Evans estimated that he heard four or five gunshots. According to Evans, he saw Cole about 15 minutes later at 75th and Carpenter. He stated that he signed his affidavit in April of 2004 after another individual, Shawn Travis, typed it.

¶ 37     On cross-examination, Evans explained that Travis, who typed his affidavit, was his aunt's former boyfriend, and that he had discussed the shooting with him around the time that Cole died. Evans stated that Travis knew the defendant from the neighborhood. Evans acknowledged that he previously identified the defendant as the shooter to the police and during testimony before the grand jury, but he testified that his prior identifications were the result of police abuse. According to Evans, the police arrested him on the night of the shooting, and they placed him alone in a room, handcuffed him to the wall, kept him in custody overnight, and did not allow him to telephone his father. He was first questioned an hour after he arrived by a detective with the last name of O'Brien and another officer. Evans testified that he initially told them he did not want to be involved, but

then later told them truthfully that Cole was the shooter. Detective O'Brien showed him statements from Johnson and Cole naming the defendant as the shooter and then Detective O'Brien proceeded to choke, slap, and beat him until he agreed to name the defendant as the shooter. Evans testified that Detective O'Brien was in the room with him and the ASA when he signed the statement, which reflected the version of events that Detective O'Brien had "forced" him to say. Evans also testified that Detective O'Brien was in the room while he testified before the grand jury. He stated that his grand jury testimony was constructed from his memory of the several statements that Detective O'Brien had shown him earlier. He acknowledged that he provided answers to the grand jury that were not given to him by Detective O'Brien, explaining that he "knew what needed to be said, as far as making it believable or whatever, to get out, you know, and follow suit with what he wanted me to do."

¶ 38    In response to questions from the court, Evans stated that he was not called to testify at the defendant's trial and that he did not give the information that Cole was the shooter to the defendant's attorneys. He also stated that portions of the affidavit prepared by Travis were "misconstrued," but he did not call attention to the inaccuracies because most of the information "was on point" and he did not "think that was that big a deal." He acknowledged that Detective O'Brien was the same detective who investigated the case that resulted in his incarceration. He also acknowledged that he never filed a complaint against Detective O'Brien and that he did not tell anyone about the abuse.

¶ 39    The State called Timothy Moran, a former Cook County Assistant State's Attorney, as a witness. Moran testified that, on August 20, 1992, he went to Area Three Police Headquarters where he spoke with Detectives O'Brien and Carroll and learned that there were several people

who had witnessed the shooting. Moran stated that he interviewed the witnesses, including Evans. During Moran's conversation with Evans, Detective Bernatek and youth Officer Jefferson were in the room as well. Moran testified that he spoke to Evans, who was not handcuffed, about the shooting. After his initial conversation with Evans, he asked the officers to leave the room so that he could determine if Evans had been mistreated by the police and to ask if he would give a handwritten statement. Evans agreed to give a handwritten statement and told him that the officers "treated him fine." Moran explained that, when Evans's statement was reduced to writing, both the youth officer and Detective Bernatek were in the room because Evans was under 18. Moran testified that he read the statement to Evans who agreed that it was correct and signed his name at the bottom of the page. Moran and both police officers also signed their names at the bottom of the page. Moran testified that Detective O'Brien was not in the room when Evans made his initial oral statement naming the defendant as the shooter and that Evans never complained he had been mistreated. He also testified that he did not notice any injuries to Evans.

¶ 40    The parties stipulated that, if called to testify, Shauna Boliker would state that, on August 20, 1992, she was an ASA and had presented several witnesses to testify before the grand jury. The witnesses were questioned as to their knowledge of the shooting that occurred on August 19, 1992. It was further stipulated that ASA Boliker would testify that one of the witnesses that testified before the grand jury was Evans. It was also stipulated that when Evans testified, "neither Detective O'Brien nor any other member of the Chicago Police Department were present in the grand jury room."

¶ 41    On November 9, 2017, the court denied the defendant's second successive postconviction petition. In a written order, the court made several findings as to the witnesses' credibility.

Regarding Evans, the court found that his credibility was "severely diminished" due to the following: his first-degree murder convictions; the differences between his affidavit and his testimony; the fact that he first alleged Detective O'Brien abused him and fabricated the contents of his statement on cross-examination; and his testimony that Detective O'Brien was present when he made his since-recanted statements was rebutted by the testimony of Moran and the stipulated testimony of Boliker. The court also found that Evans's detailed grand jury testimony was "an accurate recitation of events as recounted by eyewitnesses."

¶ 42    As to Wallace, the court found that his testimony "lacked credibility due to the overall unbelievable narrative that he conveyed to [the court] and demeanor [*sic*]." The court stated that Wallace's account contained "too many convenient coincidences," including the fact that he saw the shooting, never came forward, and then found himself in the same housing unit of the same correctional facility as the defendant. The court also found it convenient that the man Wallace identified as the real killer, Cole, was now deceased. The court also reiterated its previous findings regarding Wraggs; namely, that Wraggs's testimony did not support a claim of actual innocence because Wraggs did not see the actual shooting, could not remember the date of the shooting, and testified that he saw Cole with a silver gun when Wright testified that the shooter's gun was black. The court also noted that Perkins was an eyewitness to the shooting, and she testified at the defendant's trial that he was the shooter. The court concluded that the testimony of the defendant's three witnesses:

> "when weighed against the evidence presented at trial, falls short of providing [the defendant] of [*sic*] the complete vindication and total exoneration that are the hallmarks of an actual innocence claim. There is no basis to find that the outcome at retrial could

possibly differ based on the incredible account Evans, Wallace, and Wraggs gave this Court. Accordingly, [the defendant's] actual innocence claim falls short."

The trial court denied the defendant's second successive postconviction petition as supplemented, and this appeal followed.

¶ 43    On appeal, the defendant argues that the circuit court erred in denying his second successive postconviction petition by applying an incorrect legal standard when evaluating his actual innocence claim and by making "unsupported credibility findings" regarding Wallace. Lastly, the defendant contends that the circuit court erred in denying his *pro se* motion for leave to file a supplemental successive postconviction petition alleging that his 55-year sentence violated both the eighth amendment to the United States Constitution and the proportionate penalties clause of the Illinois Constitution. We first address the circuit court's denial of the defendant's actual innocence claim.

¶ 44    The Act provides a three-stage procedure by which defendants can assert a substantial denial of their rights under either the federal or state constitution. 725 ILCS 5/122-1 *et seq.* (West 2006). Petitions that are not summarily dismissed at first-stage proceedings advance to the second stage, where counsel is appointed to "shape the petitioner's claims into the appropriate legal form." *People v. Turner*, 187 Ill. 2d 406, 417 (1999). If the State is unsuccessful in moving to dismiss the petition at the second stage, the cause then advances to the third stage, where an evidentiary hearing is held to establish the truth of the petition's factual allegations. 725 ILCS 5/122-6 (West 2007); *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). At this hearing, the trial court may receive proof by affidavits, depositions, oral testimony, or other evidence and may order the defendant to be brought before the court. 725 ILCS 5/122-6 (West 2007).

¶ 45    In order to succeed on a postconviction claim of actual innocence, the defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial. *People v. Washington*, 171 Ill. 2d 475, 489 (1996). New evidence means it was discovered after trial and could not have been discovered earlier through the exercise of due diligence. See *People v. Burrows*, 172 Ill. 2d 169, 180 (1996). Material means the evidence is relevant and probative of the defendant's innocence. *People v. Smith*, 177 Ill. 2d 53, 82-83 (1997). Noncumulative means the evidence adds to what the jury heard. *People v. Molstad*, 101 Ill. 2d 128, 135 (1984). And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result. *People v. Ortiz*, 235 Ill. 2d 319, 336-37 (2009).

¶ 46    Here, the trial court denied the defendant's petition after it determined that his evidence of actual innocence was not conclusive. The defendant contends, however, that the circuit court reached its decision by applying the incorrect standard for determining whether evidence of actual innocence is conclusive. In support, the defendant cites to the court's statement that his evidence fell short of "the complete vindication and total exoneration that are the hallmarks of an actual innocence claim." According to the defendant, this requirement that the evidence prove "complete vindication and total exoneration" is a higher standard than what is normally required for proving a claim of actual innocence, and therefore, he was denied his due process right to a fair proceeding. The State responds that, when viewing the entirety of the court's order, it is clear that it applied the proper standard. We agree with the State.

¶ 47    The supreme court has held that, when determining if the evidence of actual innocence is conclusive, "the trial court then must consider whether that evidence places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the

guilty verdict." *People v. Coleman*, 2013 IL 113307, ¶ 97. This approach "involves credibility determinations that are uniquely appropriate for trial judges to make." *Id.* That said, "the trial court should not redecide the defendant's guilt in deciding whether to grant relief." *Id.* Rather, "[p]robability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *Id.*

¶ 48    After reviewing the whole record, we find that the circuit court applied the correct standard when determining whether the defendant's evidence of actual innocence was conclusive. To begin, we note that, in the section of its order reciting the applicable law, the court correctly stated that, in order to succeed on a postconviction petition alleging actual innocence, the defendant's evidence needed to be "of such a conclusive character that it would probably change the result on retrial." Then, after examining the defendant's new evidence when compared to the evidence presented at the defendant's trial, the court stated that it was denying the defendant's petition because there was "no basis to find that the outcome at retrial could possibly differ based on the incredible account Evans, Wallace, and Wraggs gave." In other words, the court focused on "[p]robability, not certainty" in predicting what another jury would do, which is the correct standard for determining the conclusiveness of the defendant's evidence in the context of an actual innocence claim. *Coleman*, 2013 IL 113307, ¶ 97. We conclude, therefore, that the circuit court applied the correct standard when it reviewed the conclusiveness of the defendant's evidence.

¶ 49    In reaching our decision, we acknowledge the supreme court's recent holding in *People v. Robinson*, 2020 IL 123849. In *Robinson*, the court emphasized that, when reviewing whether a defendant's evidence of actual innocence is conclusive, "[p]robability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior

evidence along with the new evidence. *Id.* ¶ 48. Relevant here, the court also expressly rejected "a standard that requires evidence of total vindication or exoneration to support a claim of actual innocence." *Id.* ¶ 55. However, *Robinson* was decided three years after the circuit court denied the defendant's actual innocence claim in the case, and therefore, the circuit court did not have the benefit of its holding when it was making its determination. Moreover, as discussed above, the record shows that, notwithstanding the reference to "total vindication or exoneration," the circuit court ultimately applied the correct standard when it found that the defendant's evidence of actual innocence was not conclusive.

¶ 50    Next, the defendant challenges the circuit court's determination that Wallace was incredible and argues that Wallace's testimony alone, when weighed against the evidence presented at the defendant's trial, should have been sufficient for the circuit court to grant him a new trial. The defendant does not make any arguments as to the court's credibility determinations of Evans or Wraggs.

¶ 51    At a third-stage evidentiary hearing, the trial court acts as the fact finder and determines the credibility of the witnesses and the weight to be given their testimony and resolves any conflicts in the testimony. *People v. Domagala*, 2013 IL 113688, ¶ 34. We review the trial court's decision to deny relief following an evidentiary hearing for manifest error. *Coleman*, 2013 IL 113307, ¶ 98. Manifest error is error that is clear, plain, and indisputable. *Id.*; *Ortiz*, 235 Ill. 2d at 333. "[A] decision is manifestly erroneous when the opposite conclusion is clearly evident." *Coleman*, 2013 IL 113307, ¶ 98. This standard of review "recognizes that 'we must give great deference to the trial court's factual findings because the trial court stands in the best position to weigh the

credibility of witnesses' " who testify at the third-stage evidentiary hearing. *People v. Hotwagner*, 2015 IL App (5th) 130525, ¶ 31 (quoting *In re Floyd*, 274 Ill. App. 3d 855, 867 (1995)).

¶ 52    In the instant case, the court found that Wallace "lacked credibility due to the overall unbelievable narrative that he conveyed to [the court] and demeanor [*sic*]." The court's written order did not elaborate as to what it found objectionable regarding Wallace's demeanor, however, it did state that Wallace's account contained "too many convenient coincidences" and featured "entirely aberrant behavior by Wallace and [the defendant]." Specifically, the court found it convenient that Wallace, an eyewitness that could prove the defendant's innocence, "happened to find himself in the same housing unit of the same correctional facility as [the defendant]" and that Wallace would share this information with defendant upon their first meeting. The court also found it convenient that the individual Wallace claimed committed the shooting, Cole, is now deceased. Moreover, the court noted that, at the defendant's trial, Perkins, who was standing next to the victims when the shooting occurred and had known the defendant since the seventh grade, identified the defendant as the shooter.

¶ 53    The defendant, nevertheless, argues that the trial court erred in its determination of Wallace's credibility. He contends that "there is simply nothing inherently unbelievable about two men, both from the same high-poverty, high-crime urban neighborhood, who were acquainted as juveniles, becoming re-acquainted later in life in the Department of Corrections." He also contends that Wallace's identification of Cole as the shooter enhances, rather than detracts, from his credibility because Cole was, in fact, convicted for his involvement in the shooting. Lastly, he contends that Perkins' credibility was impeached at trial due to her 1993 hospitalization in a psychiatric ward.

¶ 54    After reviewing the record, we find that there is nothing manifestly erroneous about the circuit court's determination that Wallace's testimony was incredible. To begin, the circuit court's credibility determination rested, in part, on Wallace's demeanor while testifying, and although the circuit court did not elaborate further, we are mindful that a witness's in-person demeanor plays a significant role in helping to determine credibility. As the supreme court has noted, "the post-conviction trial judge is able to observe and hear the witnesses at the evidentiary hearing and, therefore, occupies a 'position of advantage in a search for the truth' which 'is infinitely superior to that of a tribunal where the sole guide is the printed record.' " *People v. Coleman*, 183 Ill. 2d 366, 384, (1998) (quoting *Johnson v. Fulkerson,* 12 Ill. 2d 69, 75 (1957)). Moreover, we cannot say that the circuit court's determination that the defendant meeting Wallace in prison was a "convenient coincidence" is so erroneous that an opposite conclusion is clearly evident. We also note that the defendant's insistence that Perkins's credibility is impeached because she was hospitalized in a psychiatric ward is unpersuasive because the jury heard that information at trial and still convicted the defendant based, in part, on her eyewitness testimony. Accordingly, we conclude that the circuit court did not err when it denied the defendant's second successive postconviction petition.

¶ 55    The defendant's final contention on appeal is that the circuit court erred in denying him leave to file a supplemental successive postconviction petition alleging that his 55-year sentence, imposed for a crime he committed while he was a juvenile, violated both the eighth amendment to the United States Constitution and the proportionate penalties clause of the Illinois Constitution.

¶ 56    Before we begin our analysis, we must first address the question of whether we have jurisdiction to address this claim because the defendant's notice of appeal only references the

circuit court's November 9, 2017 order denying his petition alleging actual innocence and does not reference the court's March 16, 2016 order denying his *pro se* motion for leave to file a supplemental successive postconviction petition alleging that his sentence violated the federal and State constitutions.

¶ 57 In general, "[a] notice of appeal confers jurisdiction on an appellate court to consider only the judgments or parts of judgments specified in the notice." *People v. Lewis*, 234 Ill. 2d 32, 37 (2009). Nevertheless, "the unspecified judgment is reviewable if it is a step in the procedural progression leading to the judgment specified in the notice of appeal." (Internal quotations omitted.) *Burtell v. First Charter Service Corp.*, 76 Ill. 2d 427, 435 (1979). Here, the defendant filed a *pro se* motion for leave to file a supplemental petition for postconviction relief, which the court denied. The defendant filed a *pro se* notice of appeal after the court denied his motion, but the court ordered that the notice of appeal not be transmitted to this court because no final judgment had been entered, and therefore, the notice was prematurely filed. On November 9, 2017, the court denied the defendant relief based on the remaining allegations contained in his second successive postconviction petition. We believe that the denial of the defendant's motion for leave to file a supplemental petition for postconviction relief was a step in the procedural progression leading to the denial of his second successive postconviction petition. We find, therefore, that we have jurisdiction to review that denial.

¶ 58 In the proposed supplemental petition for postconviction relief the defendant sought to file, he asserted that his 55-year sentence for offenses committed when he was 16 years old was unconstitutional under both the eighth amendment to the United States Constitution and the proportionate penalties clause of the Illinois Constitution. The defendant argues that the circuit

court erred in denying him leave to file his *pro se* proposed supplemental petition because the proposed petition sufficiently alleged that his 55-year sentence: (1) is a *de facto* life sentence imposed by the sentencing court without a determination that he was among the rare class of offenders whose conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation; and (2) is grossly disproportionate under the proportionate penalties clause of the Illinois Constitution and the eighth amendment to the United States Constitution. As to both arguments, the defendant asserts that, in sentencing him, the trial court failed to adequately consider his youth and attendant circumstances as mandated by the Supreme Court in *Miller v. Alabama.* We address each of the defendant's arguments in turn.

¶ 59    Generally, a defendant may file only a single postconviction petition under the Act. 725 ILCS 5/122-1(f); *People v. Edwards*, 2012 IL 111711, ¶ 29. To be entitled to bring a successive postconviction petition, a defendant faces "immense procedural hurdles." *People v Davis*, 2014 IL 115595, ¶ 14. The defendant must obtain leave of court to file a successive postconviction petition. 725 ILCS 5/122-1(f) (West 2016); *People v Lusby*, 2012 IL 124046, ¶ 27. The bar against successive proceedings is relaxed in two situations: (1) where the defendant can establish cause and prejudice for failing to raise the claim in the original postconviction proceeding; or (2) where the defendant raises a colorable claim of actual innocence. *Edwards*, 2012 IL 111711, ¶¶ 22-23; 725 ILCS 5/122-1(f) (West 2016). Under the Act, "cause" is defined as an objective factor that impeded the defendant's ability to raise a specific claim during his prior postconviction proceedings; "prejudice" is occasioned by an error which so infected the trial that the resulting conviction or sentence violated due process. 725 ILCS 5/122-1(f) (West 2016). Successive postconviction petitions are "highly disfavored." *People v. Bailey*, 2017 IL 121450, ¶ 39. And

meeting the cause-and-prejudice test is a "more exacting standard" than the "gist standard" applicable to the review of initial postconviction petitions. *People v. Conick*, 232 Ill. 2d 132, 142 (2008).

¶ 60    A defendant's motion for leave to file a successive postconviction petition should be denied when the defendant's claims fail as a matter of law or are insufficient to justify further proceedings. *People v. Dorsey,* 2021 IL 123010, ¶ 33; *People v. Smith,* 2014 IL 115946, ¶ 35; *Lusby,* 2020 IL 124046, ¶ 27. Our review of the circuit court's order denying a motion for leave to file a successive postconviction petition is *de novo. Dorsey*, 2021 IL 123010, ¶ 33.

¶ 61    Here, the defendant argues that he satisfied the cause-and-prejudice test because his proposed successive postconviction petition showed "cause" where the legal basis for his constitutional claims did not exist when he filed his initial postconviction petition, and because his petition showed "prejudice" since it presented a viable claim that his 55-year sentence was unconstitutional, as-applied, under both the federal and state constitutions.

¶ 62    In *Miller v. Alabama*, the Supreme Court held that the eighth amendment to the United States Constitution "forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Miller*, 567 U.S. at 479. The Supreme Court emphasized that "[m]andatory life without parole for a juvenile precludes consideration" of numerous mitigating factors, including the juvenile's age and its "hallmark features," and the possibility of rehabilitation. *Id.*, at 477-78.  The Supreme Court also held that "a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles." *Id.* at 489. In *Montgomery v. Louisiana*, 577 U.S. 190 (2016), the Supreme Court clarified that *Miller* applies retroactively "to juvenile offenders whose convictions and sentences

were final when *Miller* was decided," including cases on collateral review. *Montgomery*, 577 U.S. at 193, 212.

¶ 63    The Illinois Supreme Court has ruled that *Miller* applies to discretionary, as well as mandatory life sentences (*People v. Holman*, 2017 IL 120655, ¶ 40), and also to *de facto* life sentences, or sentences "that cannot be served in one lifetime" and have "the same practical effect on a juvenile defendant's life as would an actual mandatory sentence of life without parole" (*People v. Reyes*, 2016 IL 119271, ¶¶ 9-10). In *People v. Buffer*, 2019 IL 122327, the supreme court concluded that a sentence exceeding 40 years was a *de facto* life sentence, requiring the sentencing court to consider "[the] defendant's youth and its attendant circumstances." *Buffer*, 2019 IL 122327, ¶¶ 41-42.

¶ 64    In this case, the State correctly asserts that the defendant was sentenced prior to the enactment of the current "truth-in-sentencing" statute, and he is, therefore, entitled to day-for-day credit. See 730 ILCS 5/3-6-3(a)(2) (West 1994) ("[T]he prisoner shall receive one day of good conduct credit for each day of service in prison other than where a sentence of 'natural life' has been imposed. Each day of good conduct credit shall reduce by one day the inmate's period of incarceration set by the court."). As a result, the State maintains that it is "likely" the defendant will only be required to serve a term of 27.5 years, and as a result, his sentence is below the 40-year mark for a *de facto* life sentence. We agree with the State.

¶ 65    In *Dorsey*, 2021 IL 123010, the supreme court held that, when the applicable statutory good-conduct scheme provides a defendant some meaningful opportunity to obtain release after serving less than 40 years' incarceration, the defendant's sentence is not a *de facto* life sentence in violation of the eighth amendment to the United States Constitution. *Dorsey*, 2021 IL 123010, ¶

64. The supreme court found that the defendant in that case had not been sentenced to a *de facto* life sentence, and as a consequence, could not satisfy the prejudice prong of the cause-and-prejudice test for bringing a successive postconviction with respect to his eighth amendment claim. *Id.* ¶ 65.

¶ 66    The same rationale applies to the facts in the instant case. Although the defendant was sentenced to 55 years' imprisonment, the statutory good-conduct scheme applicable to his sentence provides him some meaningful opportunity to obtain release after serving 27.5 years, and therefore, his sentence is not a *de facto* life sentence in violation of the eighth amendment to the United States Constitution. It follows, therefore, that the defendant cannot satisfy the prejudice prong of the cause-and-prejudice test for bringing a successive postconviction with respect to his eighth amendment claim.

¶ 67    Having now determined that the defendant cannot satisfy the prejudice requirement for bringing a successive postconviction petition based on an eighth amendment violation, there still remains the question of whether his proposed supplemental postconviction petition "stated an arguable basis of a claim that a 55-year prison term is grossly disproportionate as applied to him" in violation of the proportionate penalties clause of the Illinois Constitution. His argument in this regard is based on the assertion that, in sentencing him, the trial court failed to adequately consider his youth and attendant circumstances.

¶ 68    The proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Our supreme court has explained that the proportionate penalties clause's unique emphasis on rehabilitative potential

provides " a limitation on penalties beyond those afforded by the eighth amendment [to the United States Constitution]." *People v. Clemons*, 2012 IL 107821, ¶¶ 39-41.

¶ 69    In addition to incorrectly asserting that his 55-year sentence is a *de facto* life sentence, the defendant appears to argue that his sentence violates the proportionate penalties clause of the Illinois Constitution as applied to him because: (1) the trial court failed to adequately consider his youth and attendant circumstances when sentencing him, apparently relying on the Supreme Court's holding in *Miller* and its progeny; and (2) the sentence he received is disproportionate to his individual characteristics and the circumstances of his offenses.

¶ 70    A criminal sentence violates the proportionate penalties clause of the Illinois Constitution if the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community. *People v. Miller*, 202 Ill. 2d 328, 338 (2002). It is undisputed in this case that the defendant's 55-year sentence falls within the statutory range for the offense of first-degree murder. In *People v. Miller*, the supreme court held that " '[w]hen the legislature has authorized a designated punishment for a specified crime, it must be regarded that its action represents the general moral ideas of the people, and the courts will not hold the punishment so authorized as either cruel and unusual, or not proportioned to the nature of the offense.' " *Id.* at 339 (quoting *People ex rel Bradley v. Illinois State Reformatory,* 148 Ill. 413, 421-22 (1894)). Recognized as an exception, however, is a sentence that is so wholly disproportionate to the offense committed that it shocks the moral sense of the community. *Id.*

¶ 71    The defendant in this case was convicted of both murder and attempted murder in connection with a shooting incident that resulted in the death of one individual and the injury of another. The evidence at trial established that the defendant approached a group of people standing

at a bus stop and fired several shots, striking the victims, King and Wright. Thereafter, the defendant chased King and shot her again, resulting in King's death. A sentence of 55-years' incarceration is neither disproportionate to the offense committed, nor does it shock the moral sense of the community.

¶ 72     Nevertheless, the defendant argues that his proposed supplemental postconviction petition stated an arguable basis for a claim that his sentence violates the proportionate penalties clause of the Illinois Constitution as applied to him because the trial court failed to adequately consider his youth and attendant circumstances when sentencing him. As noted earlier, in support of the argument, the defendant relies upon the Supreme Court's holding in *Miller* and its progeny, which were decided in the context of an eighth amendment violation claim, not a claim based upon the proportionate penalties clause. In *Dorsey,* 2021 IL 123010, ¶ 73, the supreme court found that "*Miller's* announcement of a new substantive rule under the eighth amendment does not provide cause for a defendant to raise a claim under the proportionate penalties clause." The supreme court reasoned that "Illinois courts have long recognized the differences between persons of mature age and those who are minors for purposes of sentencing. Thus, *Miller*'s unavailability prior to 2012 at best deprived defendant of 'some helpful support' for his state constitutional law claim, which is insufficient to establish 'cause.' " *Id.* (citing *People v. LaPointe*, 2018 Il App (2d) 160903, ¶ 59.). The supreme court's reasoning in *Dorsey* also establishes that the defendant in this case cannot satisfy the cause prong of the cause-and-prejudice test for bringing a successive postconviction petition with respect to his proportionate penalties claim under the Illinois Constitution.

¶ 73    For the reasons stated, we affirm both the circuit court's denial of the defendant's successive postconviction petition asserting a claim of actual innocence following a third-stage evidentiary hearing, and its denial of the defendant's *pro se* motion for leave to file a supplemental successive postconviction petition asserting claims that his 55-year sentence violated both  the eighth amendment to the United States Constitution and the proportionate penalties clause of the Illinois Constitution.

¶ 74    Affirmed.

Petitioner-Appellant:  Atty: Douglas Robert Hoff – Lead, Office of the Appellate Defender; James E. Chadd, State Appellate Defender; Patricia Mysza, Deputy Appellate Defender; 203 N. LaSalle Street, 24th Floor, Chicago, IL 60601, PHONE: 312.814.5472

Respondent-Appellee: Alan J. Spellberg, Gina DeVito, Asst. State's Attorneys; KIMBERLY M. FOXX, State's Attorney, County of Cook, Room 309 - Richard J. Daley Center, Chicago, Illinois 60602 PHONE: 312.603-5496